Pauline EATON, Plaintiff–Appellant,

v.

James McLAIN and wife, Tammy McLain, Defendants–Appellees.

Supreme Court of Tennessee, at Knoxville.

October 31, 1994.

Petition to Rehear Nov. 9, 1994.

Rehearing Denied Jan. 17, 1995.

John S. Bingham, Hawkins, Moody, Bingham, Miller & Associates, Kingsport, for plaintiff-appellant.

James W. Harrison, Taylor, Reams, Tilson, & Harrison, Morristown, for defendants-appellees.

## OPINION

DROWOTA, Justice.

In this premises liability action, the plaintiff Pauline Eaton appeals from the Court of Appeals' reversal of a judgment in her favor based on a jury verdict. In its verdict, the jury found that the negligence of both plaintiff and defendants, James and Tammy McLain, contributed to the plaintiff's injuries; and it allocated 40% of the total negligence to Eaton and 60% to the McLains. This case presents two issues for our determination: (1) whether the Court of Appeals was correct in holding that the trial court should have granted the defendants' motion for judgment notwithstanding the verdict because the "evidence was overwhelming that the plaintiff's degree of fault was greater than or equal to that of the defendants"; and (2) whether the Court of Appeals was correct in its alternative holding—that the plaintiff failed to present legally sufficient evidence as to the duty element in her claims of negligence.

## FACTS AND PROCEDURAL HISTORY

On March 23, 1991, Pauline Eaton travelled to the home of Tammy and James McLain—her daughter and son-in-law—to spend the night. Ms. Eaton arrived at the McLains' about 6:00 p.m., and she and her daughter and son-in-law remained in the kitchen/den area of the home watching television until approximately 9:30 or 10:00. At that time, Ms. Eaton decided to go to bed. Because the McLains' daughter Melanie was spending the night at a friend's house, Ms. Eaton was advised by her daughter to sleep in Melanie's bedroom. This bedroom is located along a long, narrow hallway that connects the kitchen/den area on one end of the house to the master bedroom on the other end. Directly across the hall from Melanie's bedroom are two virtually identical doors that are adjacent to one another: the door to the right opens into a bathroom; and the door to the left opens onto a flight of stairs leading down to the basement. At the time

of Ms. Eaton's stay, the lock on the basement door was inoperable.

The McLains decided to go to bed about 11:00. While en route down the hallway to the master bedroom, Tammy McLain closed both the door to the bathroom and the door leading to the basement stairwell; she also switched off the hallway and bathroom lights.

Ms. Eaton awoke about 5:00 the next morning needing to go to the bathroom. Although it was very dark when she awoke, Ms. Eaton did not turn on either the light in Melanie's bedroom or the light in the hallway as she attempted to make her way to the bathroom. Instead, she proceeded across the hall and opened the basement door, believing it to be the bathroom door, and stepped inside. Ms. Eaton fell down the stairs and sustained injuries to her elbow and back.

Ms. Eaton subsequently brought an action against her daughter and son-in-law, alleging that they were negligent in turning the hallway and bathroom lights off, in failing to provide a working lock on the basement door, and in failing to warn her of the location of the stairs. At the trial, Ms. Eaton testified that she did not turn on any lights before proceeding in the dark because she was afraid of awakening her grandson, who was asleep in another bedroom a short distance down the hall. Ms. Eaton testified that she had been in the McLains' home before the night of the accident, but that she was not completely familiar with the layout of the home. She also testified that she knew that the house had a basement, and had in fact been in the basement, but did not remember if she had descended the basement stairs on any of her previous visits. Ms. Eaton also stated that she did not remember if she had used the hall bathroom before the night of the accident. Finally, Ms. Eaton testified that the McLains did not warn her of the location of the stairs, and that they did not provide a night light or take other precautions to prevent the accident.

After the conclusion of the evidence, the defendants moved for a directed verdict, which was denied by the trial court. The trial court then submitted the case to the jury. In its verdict, the jury found that the negligence of both the plaintiff and defendants proximately caused plaintiff's injuries, and it attributed 40% of the total negligence to the plaintiff and 60% to the defendants. After the trial court denied their motion for a judgment notwithstanding the verdict, the defendants appealed to the Court of Appeals.

The Court of Appeals reversed the judgment and dismissed the action. The Court's holding was predicated on two different rationales. First, the Court noted that Tennessee law prior to *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn.1992), provided that when a plaintiff voluntarily takes a "step-in-the-dark" into an unfamiliar, unlighted area, he is deemed to have been contributorily negligent as a matter of law and therefore is precluded from recovering for any resulting injuries.[1] Although the Court realized that *McIntyre* abolished the defense of contributory negligence, it held that in view of the policy considerations underlying the "step in the dark" decisions, the trial court erred in failing to grant the defendants' motion for JNOV because the evidence was "overwhelming" that Ms. Eaton's negligence either equalled or was greater than the McLains' negligence.

The Court also held that the motion for JNOV should have been granted because the record contained no material evidence to support the jury's finding that the defendants owed the plaintiff a duty to protect her against the specific acts set forth in the complaint.[2]

1. The Court cited *Loew's Nashville & Knoxville Corp. v. Durrett*, 18 Tenn.App. 489, 79 S.W.2d 598 (1934); *Park v. Sinclair Refining Co.*, 24 Tenn.App. 204 142 S.W.2d 321 (1940); and *Goodman v. Memphis Park Commission*, 851 S.W.2d 165 (Tenn.App.1992) as examples of the "step-in-the-dark" rule.

2. Special Judge Wade dissented from the majority opinion, stating that: (1) the majority's holding on the duty element invaded the function of the jury; and (2) that the majority's holding that the jury erred in determining the relative fault of the parties effectively served to reinstate the "step-in-the-dark" rule as a complete bar to recovery. In regard to the majority's duty holding, Wade stated that certain facts in the case—namely that the plaintiff was an older woman who was unfamiliar with the layout of the house and that

We granted Ms. Eaton's Rule 11 application in order to clarify the circumstances in which a trial or appellate court may hold, as a matter of law, that the plaintiff's degree of fault is equal to or greater than the defendant's. We also granted the application to address the Court's holding regarding the duty aspect of her negligence claims.

## THE DIRECTED VERDICT/JNOV ISSUE

The standards governing trial courts in ruling on motions for directed verdict or JNOV in negligence cases are well established. In ruling on the motion, the court must take the strongest legitimate view of the evidence in favor of the non-moving party. In other words, the court must remove any conflict in the evidence by construing it in the light most favorable to the non-movant and discarding all countervailing evidence. The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. *Sauls v. Evans*, 635 S.W.2d 377 (Tenn.1982); *Holmes v. Wilson*, 551 S.W.2d 682 (Tenn. 1977). If there is any doubt as to the proper conclusions to be drawn from the evidence, the motion must be denied. *Crosslin v. Alsup*, 594 S.W.2d 379 (Tenn.1980).

Under the pre-*McIntyre* fault system, the question for the trial court on a motion for directed verdict/JNOV alleging contributory negligence was: if, after taking the strongest legitimate view of the evidence in the plaintiff's favor, could it be determined beyond question that the plaintiff was guilty of *any* negligence that proximately caused the resulting injuries? If the answer to this question was "yes," then a directed verdict was proper. This situation was rare, however, for as we emphasized in *Frady v. Smith*, 519 S.W.2d 584 (Tenn.1974):

> the lock on the basement door was inoperable— entitled that element (and the other elements of the negligence action) to go to the jury. In regard to the majority's apportionment of fault holding, Wade stated that the pre-*McIntyre* "step-in-the-dark" cases cited by the majority were decided on the basis of the doctrine of assumption of the risk. Wade then reasoned that because the assumption of the risk doctrine had been merged into the principles of comparative

Negligence, contributory negligence, and proximate cause are ordinarily issues to be decided by the jury, and can be withdrawn from the jury and decided by the court only in those cases where the facts are established by evidence free from conflict, and the inference from the facts is so certain that all reasonable men, in the exercise of a free and impartial judgment, must agree upon it.

519 S.W.2d at 586. *See also Brookins v. The Round Table, Inc.*, 624 S.W.2d 547 (Tenn. 1981); *Schindler v. Southern Coach Lines*, 188 Tenn. 169, 217 S.W.2d 775 (1949).

This Court's adoption of the doctrine of comparative fault in *McIntyre* does not change these standards governing the trial court's assessment of the evidence; nor does it change the established standard governing the trial court's ultimate decision of whether to grant the motion. The trial court still must take the strongest legitimate view of the evidence in favor of the non-movant; and it must grant the motion only if reasonable minds could not differ as to the legal conclusions to be drawn from that evidence.

The recitation of these standards of review does not, however, provide a satisfactory answer to the issue before us because *McIntyre* has radically changed the question to be asked by the trial court on a motion for directed verdict/JNOV which alleges negligence on the part of the plaintiff. The question now is *not* whether the plaintiff was guilty of *any* negligence that proximately caused the resulting injuries. Instead, the question is: assuming that both plaintiff and defendant have been found guilty of negligent conduct that proximately caused the injuries, was the *fault attributable to plaintiff equal to or greater than the fault attributable to the defendant.*[3]

> fault, the matter of apportioning fault was strictly one for the jury.

3. This is, of course, not the exclusive ground upon which the defendant may move for a directed verdict/JNOV in a negligence action. The motion may still be made on the ground that the plaintiff has failed to present legally sufficient evidence as to one of the elements of the cause of

The trial court's determination as to whether reasonable minds could differ on this new question is made more difficult by the fact that it has not been provided with any guidance as to how to apportion *fault.* The formulation of workable, meaningful standards to guide trial courts in this area is no simple matter; this is evidenced by the marked divergence of opinion of courts and commentators on whether fault should be apportioned according to the nature of the parties' conduct,[4] the closeness of the causal relationship between the conduct and the injuries,[5] or combination of the two.[6] Some commentators have taken an extreme position on this issue, arguing that no rational or objective basis for the apportionment of fault exists.[7]

We are unpersuaded by the contention that there is no meaningful way to provide guidance to trial courts and juries in apportioning fault, or by the alternative contention that it is unwise to provide any such guidance. While we agree that it is impossible to formulate an exhaustive set of guidelines for apportioning fault that will adequately cover the manifold circumstances in which negligence actions may arise, we nevertheless believe that trial courts and juries must have some guidance, however imprecise and imperfect, in discharging their respective duties in apportioning fault.

Although several sets of guidelines have been suggested by various courts and commentators,[8] we prefer to utilize familiar principles of Tennessee law that have been subsumed by our adoption of a system of comparative fault. Some of these principles

action. See the discussion of "The Duty Issue," *infra.*

4. *See e.g., Gele v. Wilson,* 616 F.2d 146, 147–48 (5th Cir.1980); *Pan–Alaska Fisheries, Inc. v. Marine Constr. & Design Co.,* 402 F.Supp. 1187 (W.D.Wash.1975), *vacated on other grounds,* 565 F.2d 1129 (9th Cir.1977); *State v. Kaatz,* 572 P.2d 775, 782, (Alaska 1977); V. Schwartz, Comparative Negligence, § 17.1, at 293–94 (1974); W. Prosser, *Comparative Negligence,* 51 Mich. L.Rev. 465, 481 (1953).

5. *See, e.g., Murray v. Fairbanks Morse,* 610 F.2d 149, 159 (3d. Cir.1979); *Coney v. J.L.G. Industries,* 97 Ill.2d 104, 73 Ill.Dec. 337, 343, 454 N.E.2d 197, 203 (1983); *General Motors v. Hopkins,* 548 S.W.2d 344, 352 (Tex.1977); *Busch v. Busch Constr., Inc.,* 262 N.W.2d 377, 394 (Minn. 1977); A. Twerski, *From Defect to Cause to Comparative Fault—Rethinking some Product Liability Concepts,* 60 Marq.L.Rev. 297, 326 (1977). Most of the authorities holding that causation is the only variable in the fault equation have done so in the context of products liability actions, where the conduct of the defendant is not an issue.

6. *See e.g.,* Unif. Comparative Fault Act § 2(b), 12 U.L.A. 49 (1977); *Prior v. United States Postal Service,* 985 F.2d 440, 442 (8th Cir.1993); *Kreppein v. Celotex Corp.,* 969 F.2d 1424, 1426–27 (2d. Cir.1992); *Cerretti v. Flint Hills Rural Elec. Co-op,* 251 Kan. 347, 837 P.2d 330, 347 (1992); *Kohler v. Dumke,* 13 Wis.2d 211, 108 N.W.2d 581, 583–84 (1961).

7. The most forceful advocate of this view is probably Richard Epstein, a leading proponent of the Law and Economics School. *See* R. Epstein, *Plaintiff's Conduct in Products Liability Actions: Comparative Negligence, Automatic Division and Multiple Parties,* 45 J. Air L. & Com. 87, 109 (1979); *see also* Aiken, *Proportioning Comparative Negligence—Problems of Theory and Special Verdict Formulation,* 53 Marq.L.Rev. 293, 295 (1970).

8. For example, in his treatise on comparative negligence, Professor Victor Schwartz argues that only the parties' conduct should be considered in apportioning fault. Schwartz then goes on to list four factors to help juries assess that conduct: (1) the probability, from the negligent actor's point of view, that the particular type of harm would occur which in fact did occur; (2) the extent to which either plaintiff or defendant, as an ordinary reasonable person, would realize that this particular harm might occur; (3) the value, if any, of the party taking the particular risk; and (4) if something of value could have been gained by the party's taking the risk, was there a more reasonable method of obtaining that value. V. Schwartz, Comparative Negligence, § 17.1 (1974). Another set of factors for use in apportioning fault was set forth by the Eighth Circuit Court of Appeals in *Associated Engineers, Inc. v. Job,* 370 F.2d 633 (8th Cir. 1966). In an opinion authored by then-Judge Harry Blackmun, the *Job* court engaged in an extensive analysis of South Dakota law and enunciated the following three factors for determining if the plaintiff's negligence was more than "slight" as a matter of law: "the precautions [the plaintiff] took for his own safety; the extent to which [the plaintiff] should have comprehended the risk as the result of warnings, experience, or other factors; and the foreseeability of injury as a consequence of his conduct." *Job,* 370 F.2d at 641. *See also* D. Sobelsohn, *Comparing Fault,* 60 Ind.L.J. 413 (1985), in which the author argues that a "Hand formula" analysis should be used in assessing fault.

have already been explicitly merged into the new question of the relative fault of the parties. For example, we no longer have the separate common law doctrines of remote contributory negligence and last clear chance, but we were careful to note in *McIntyre* that the "circumstances formerly taken into account by those two doctrines will henceforth be addressed when assessing relative degrees of fault." *McIntyre*, 833 S.W.2d at 57. Moreover, although we abolished the doctrine of implied assumption of risk as a complete bar to recovery in *Perez v. McConkey*, 872 S.W.2d 897 (Tenn.1994), we added that the doctrine of "secondary implied assumption of risk"—which concerns the reasonableness of the plaintiff's conduct in confronting the risk after the defendant's negligent conduct has been established—"should be determined under the principles of comparative fault." *Perez*, 872 S.W.2d at 905. Although the above-mentioned doctrines no longer have any independent existence, and thus cannot be invoked to completely bar recovery by the plaintiff, the principles of a given doctrine, if relevant, are still to be considered by the jury in apportioning fault. If the jury instructions on the fault apportionment question do not include these principles, but are instead completely open-ended, the legitimate policy considerations underlying these doctrines will be effectively removed from the question, a result unintended by our adoption of a system of comparative fault.

While the above-mentioned principles have been explicitly merged into our new fault system, they do not provide the exclusive source of guidance to trial courts and juries

on this important question. The policy considerations underlying two other traditional exceptions to the doctrine of contributory negligence, the sudden emergency doctrine, *see Johnson v. Copeland,* 178 Tenn. 431, 158 S.W.2d 986, 988, (1942), and the rescue doctrine, *see Ruth v. Ruth,* 213 Tenn. 82, 372 S.W.2d 285, 288–89 (1963), have been implicitly subsumed by our decision in *McIntyre* and should also impact the jury's apportionment of fault between the parties in an appropriate case. Moreover, our law under the pre-*McIntyre* fault system recognized that the fault of minors was to be determined in light of the individual minor's age, experience, training, education, maturity and other factors. *Arnold v. Hayslett,* 655 S.W.2d 941, 947 (Tenn.1983). This remains the case under our system of comparative fault.

■ In summary, the percentage of fault assigned to each party should be dependent upon all the circumstances of the case, including such factors as: (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff;[9] (2) the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it;[10] (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff;[11] (4) the existence of a sudden emergency requiring a hasty decision;[12] (5) the significance of what the party was attempting to accomplish by the conduct, such as an attempt to save another's life;[13] and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.[14]

---

9. This factor is derived from the doctrine of remote contributory negligence. For a discussion of that doctrine, see *Arnold v. Hayslett*, 655 S.W.2d 941, 945 (Tenn.1983); *Street v. Calvert*, 541 S.W.2d 576, 585 (Tenn.1976).

10. This factor is derived from the doctrine of "secondary implied assumption of risk" that was abolished in *Perez v. McConkey*, 872 S.W.2d 897 (Tenn.1994).

11. This factor is derived from the doctrine of last clear chance. For a discussion of this doctrine, see *Roseberry v. Lippner*, 574 S.W.2d 726, 728 (Tenn.1978); *Street v. Calvert*, 541 S.W.2d 576, 583–84 (Tenn.1976).

12. This factor is derived from the doctrine of sudden emergency. *See Johnson v. Copeland,* 178 Tenn. 431, 158 S.W.2d 986, 988 (1942).

13. This factor is derived from the rescue doctrine. *See Ruth v. Ruth,* 213 Tenn. 82, 372 S.W.2d 285, 288–89 (1963).

14. This factor is derived from pre-*McIntyre* law as to minors. *See Arnold v. Hayslett,* 655 S.W.2d 941 (Tenn.1983); *Standridge v. Godsey,* 189 Tenn. 522, 226 S.W.2d 277 (1950). We have relied heavily on the Uniform Comparative Fault Act, 12 U.L.A. 42 (1977) in formulating these guidelines. The Committee Comment to § 2(b) of the Act provides:

We do not wish to imply from our enumeration of these factors that they constitute an exclusive list for the purpose of apportioning fault between the negligent parties. As stated above, the fault apportionment question is ultimately dependent upon all the circumstances of the case; and juries will continue, as they have in the past, to rely upon their common sense and ordinary experience in apportioning fault. Nor do we wish to imply that these factors will not need to be revised or expanded at some future date as we are presented with specific factual situations. We have only attempted in this opinion to give general guidance to the bench and bar; and any unresolved questions with respect to the factors must wait for another day. Again, while we realize that all these factors will not be applicable to every case, we believe that this approach is superior to leaving trial courts and juries completely without standards in this process.[15] Therefore, we hold that the trial court should take the factors into consideration, if applicable, in ruling on a motion for directed verdict or JNOV which alleges negligence on the part of the plaintiff. The trial court should also include the factors, if applicable, in its instructions to the jury on the fault apportionment question.

### THE DUTY ISSUE

We need not, however, decide the question of whether Ms. Eaton's fault equalled or exceeded that of the McLains' as a matter of law because we agree with the Court of Appeals that Ms. Eaton failed to submit legally sufficient evidence as to the duty element of her claims of negligence.

■ Before 1984, social guests in Tennessee were classified as "licensees." *Hall v. Duke*, 513 S.W.2d 776 (Tenn.1974); *Olsen v. Robinson*, 496 S.W.2d 462 (Tenn.1973). The effect of this classification was that premises owners owed the social guest no duty except to refrain from willfully injuring him, from committing negligence so gross that it constituted willfulness, and to refrain from leading the guest into a "trap." *Walker v. Williams*, 215 Tenn. 195, 384 S.W.2d 447, 451 (1964). The licensee status was justified on the theory that because a social guest, unlike a business invitee, conferred no interest or advantage to the premises owner, he was deemed to have taken the premises as he found them. *Hatcher v. Cantrell*, 16 Tenn.App. 544, 65 S.W.2d 247 (1933); *see also Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630–32, 79 S.Ct. 406, 410, 3 L.Ed.2d 550 (1959). In *Hudson v. Gaitan*, 675 S.W.2d 699, 703 (Tenn.1984), however, we abandoned the licensee status for social guests, holding instead that the premises owner owed to the social guest the same duty as that owed to an invitee—a duty of reasonable care under all the circumstances. Therefore, the McLains owed Ms. Eaton a duty to maintain the premises in a reasonably safe and suitable condition; this general

In comparing the fault of the several parties for the purpose of obtaining percentages there are a number of implications arising from the concept of fault. The conduct of the claimant or of any defendant may be more or less at fault, depending on all the circumstances including such matters as (1) whether the conduct was mere inadvertence or engaged in with an awareness of the danger involved; (2) the magnitude of the risk created by the conduct, including the number of persons endangered and the potential seriousness of the injury; (3) the significance of what the actor was trying to attain by his conduct; (4) the actor's superior or inferior capacities; and (5) the particular circumstances, such as the existence of an emergency requiring a hasty decision.

⁙

In determining the relative fault of the parties, the fact-finder will also give consideration to the relative closeness of the causal relationship of the negligent conduct of the defendant and the harm to the plaintiff. Degrees of fault and proximity of causation are inextricably mixed, as a study of last clear chance indicates, and that common law doctrine has been absorbed in this Act.

This approach was adopted by the Louisiana Supreme Court in *Watson v. State Farm Fire and Cas. Ins. Co.*, 469 So.2d 967, 973–74 (La.1985).

15. One of our concerns is that when a jury is given absolutely no guidance in its apportionment of fault, that finding is effectively unreviewable by an appellate court. This fact stands in marked distinction to a finding of contributory negligence under the pre-*McIntyre* system, which was reviewable because the jury was charged as to the elements of negligence. Although the application of the elements of negligence to the facts of the case under the old system was often difficult, at least the appellate court had some standard by which to judge the jury's actions.

duty included the responsibility of either removing or warning against any latent dangerous condition on the premises of which the McLains were aware or should have been aware through the exercise of reasonable diligence. *Dawson v. Sears, Roebuck & Co.,* 217 Tenn. 72, 394 S.W.2d 877 (1965); *Chambliss v. Shoney's Inc.,* 742 S.W.2d 271 (Tenn. App.1987); *Teal v. E.I. DuPont de Nemours and Co.,* 728 F.2d 799 (6th Cir.1984).

The Court of Appeals did not cite any authority to support its conclusion that the McLains owed no duty to Ms. Eaton to leave the lights on, to lock the basement door, or to warn her of the location of the stairs. This is understandable, however, because the premises owner's general duty to provide reasonably safe premises to social guests has been in place for only a relatively short period of time in Tennessee, and thus there has been no case law indicating the specific parameters of this duty. Therefore, we must examine the concept of duty generally in order to determine whether the McLains' duty to maintain reasonably safe premises included the specific responsibility to leave the lights on, lock the basement door, or warn of the location of the staircase.

This Court has recently enunciated the proper analysis to be used in determining the scope of the duty of care in a negligence case. In *Doe v. Linder Constr. Co.,* 845 S.W.2d 173 (Tenn.1992), we stated:

> The term reasonable care must be given meaning in relation to the circumstances. [citation omitted]. Ordinary, or reasonable, care is to be estimated by the risk entailed through probable dangers attending the particular situation and is to be commensurate with the risk of injury. [citation omitted]. The risk involved is that which is foreseeable; a risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable. Foreseeability is the test of negligence. If the injury which occurred could not have been reasonably foreseen, the duty of care does not arise, and even though the act of the defendant in fact caused the injury, there is no negli-

gence and no liability. 'The plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility, and that some action within the [defendant's] power more probably than not would have prevented the injury.' [citation omitted].

.  .  .  .  .

> The pertinent question is whether there was any showing from which it can be said that the defendants reasonably knew or should have known of the probability of an occurrence such as the one which caused the plaintiff's injuries.

*Doe,* 845 S.W.2d at 178.

As indicated in *Doe,* the question of whether the McLains' general duty of care encompasses the duty to guard against the acts set forth in the complaint involves an analysis of the foreseeability of the risk to which Ms. Eaton was exposed. In other words, the issue is whether Ms. Eaton has made "any showing from which it can be said that the *defendants reasonably knew or should have known of the probability of an occurrence such as the one which caused [her] injuries."* *Id.* (emphasis added).

■ We are of the opinion that no such showing has been made. In order for the McLains to be charged with the duty to leave on the light in the hall and to lock the basement door, they must have been able to reasonably foresee that Ms. Eaton would get out of bed in total darkness, walk across the hall, and step into the basement stairwell, all without turning on any lighting whatsoever. While our holding would likely be different if no lighting had been provided or if it had been inoperative, Ms. Eaton's failure to turn on any lights, coupled with her willingness to open the door and step into an unfamiliar area, is such a radical departure from reasonable conduct under the circumstances that the McLains could not have reasonably foreseen that conduct and its consequences. To hold otherwise would necessarily cast the premises owner in the role of an absolute insurer of the social guest's safety, which is not contemplated by our negligence law. *See McCormick v. Waters,* 594 S.W.2d 385, 387 (Tenn.1980); *Roberts v. Roberts,* 845 S.W.2d

225, 227 (Tenn.App.1992). *See also Bohenko v. Grzyb*, 21 Mass.App. 961, 488 N.E.2d 804, 805 (1986) (premises owner not negligent as a matter of law for failing to leave light on for friend attempting to enter home late at night); *cf. Quinlan v. Cecchini*, 41 N.Y.2d 686, 394 N.Y.S.2d 872, 875, 363 N.E.2d 578, 581 (Ct.App.1977) (failure to leave light on may constitute negligence where the visitor was unfamiliar with home, the stairwell was open, and the door to vestibule in which stairwell was located swung open in such a way as to conceal light switch).

Moreover, we hold that the McLains did not have a duty to warn Ms. Eaton of the location of the stairs. Although Tennessee law provides that premises owners owe invitees the duty to warn of latent or hidden dangers, this duty does not arise if the danger is open and obvious. *Jackson v. Tennessee Valley Authority*, 413 F.Supp. 1050, 1056 (M.D.Tenn.1976); *Odum v. Haynes*, 494 S.W.2d 795, 800 (Tenn.App. 1972). Because stairs descending from a hallway to a basement are a common feature of many homes, *see Alcorn v. Stepzinski*, 185 Ill.App.3d 1, 132 Ill.Dec. 901, 904, 540 N.E.2d 823, 826 (1989) and *Duckers v. Lynch*, 204 Kan. 649, 465 P.2d 945, 950 (1970), they are not inherently dangerous.[16]

Although there are no factually similar Tennessee cases to support our holding, it is buttressed by similar decisions from other jurisdictions, the best example being *Schlicht v. Thesing*, 25 Wis.2d 436, 130 N.W.2d 763 (1964). In *Schlicht*, the plaintiff brought an action against her daughter and son-in-law for injuries she sustained from a fall down the basement stairs of their home. The injuries occurred when the plaintiff opened the door leading to the basement and stepped in, believing that the door led to a bedroom. The plaintiff's erroneous belief was due to the fact that the defendants had remodeled the house and had moved the basement door and stairway to the hallway on which the doors to the bedrooms were located. It was undisputed that the basement door was unlocked and the hallway was unlighted. It was also undisputed that the defendants did not inform plaintiff that the location of the basement stairway had been changed.

After the trial court granted the defendants' motion to dismiss for failure to state a claim, the Wisconsin Supreme Court affirmed in part and reversed in part, reasoning as follows:

> We start with the premise that plaintiff was unaware that one of the four doors in the hallway in the new addition to defendants' home opened on a flight of stairs descending to the basement. Three specific acts of negligence are charged against defendants ...:
>
>> That the defendants were negligent toward the plaintiff, particularly in the following respects:
>>
>> (a) In failing to warn the plaintiff, Edna Schlicht, of the existence of such basement stairway in close proximity to the bedroom and other doors in the hallway.
>>
>> (b) In failing to have said basement door locked.
>>
>> (c) In failing to have said hallway and the basement stairs sufficiently lighted.
>
> We eliminate from consideration the allegation of subparagraph (b) that defendants were negligent in failing to lock the basement door. It would be imposing an unreasonable requirement on homeowners to require them to lock basement doors every time a baby-sitter is employed in the household.
>
> This leaves for consideration the allegations of subparagraphs (a) and (c). Because we must interpret the amended complaint liberally in favor of stating a cause of action, we construe the allegation of subparagraph (c) with respect to lighting as meaning that no adequate lighting facility was installed in the hallway, rather than a mere failure of defendants to have had an existing light turned on. This is crucial because if the hallway was equipped with an adequate electric light activated by a switch or pull cord, no negligence could be predicated on defendants' failure to have

---

16. *See also Casby v. Flint*, 520 So.2d 281 (Fla. 1988) (multiple floor levels in dimly lit room not inherently dangerous because levels are so commonplace that the possibility of their existence is known to all; therefore host had no duty to warn guests of differences in floor levels).

switched on such light before turning the premises over to plaintiff.

The owner of premises owes his invitee the alternative duty of either having his premises in a reasonably safe condition or of giving the invitee adequate and timely warning of latent and concealed perils which are known to the owner but not to the invitee [citation omitted]. [W]hen the condition contended to constitute an unreasonable risk is obvious to one in the exercise of ordinary care ... there is no duty on the owner or occupier to warn [citation omitted]. Ordinary care requires that one turn on a light before proceeding into an unfamiliar area. If defendants provided adequate lighting facilities, plaintiff was required to use them. Use of the light would have made any danger arising from the presence of the stairway obvious and consequently defendants would have had no duty to warn of such danger. Defendants, therefore, would not be answerable for dangers arising wholly from plaintiff's conduct.

However, since the allegation of the amended complaint with respect to failure to have the hallway sufficiently lighted is subject to the interpretation that there were no adequate lighting facilities in the hallway, we conclude that a cause of action is spelled out because of defendants' failure to warn plaintiff of the danger existing in the location of the basement stairway. Our holding in this respect is limited to determining that under the facts pleaded a jury issue is raised as to whether defendants were negligent in failing to give such warning to plaintiff. It is obvious that plaintiff failed to exercise reasonable care for her own safety but that would not bar her from recovery unless her negligence equalled or exceeded any found negligence on the part of defendants.

*Schlicht*, 130 N.W.2d at 766–67.

On remand, the defendants filed a motion for summary judgment and submitted evidence that the hallway was equipped with lights but that plaintiff had failed to turn them on. The trial court then granted a summary judgment in favor of the defendants on the failure-to-warn claim. The Supreme Court affirmed the judgment for the following reasons:

> [I]t is argued that the defendants owed the plaintiff the duty to warn of the dangers or the hazards of the relocated stairway. There is some evidence Edna Schlicht did not know the exact location of the master bedroom and did not know the basement stairs had been relocated to the end of the hallway. On a motion for summary judgment we accept as a fact the plaintiff did not know the location of the master bedroom and that the basement stairway had been relocated. However, we find no hidden or concealed defects or perils in the placement of the stairway. Stairs leading from hallways are common in homes and even to one temporarily in a strange home, an owner would not ordinarily realize an unknown stairway involved an unreasonable risk. We find no duty upon the defendants to warn Ms. Schlicht of the relocated stairway because it would have been obvious to the plaintiff if she had exercised ordinary care and used the available lighting facilities. We cannot hold the defendants should have reasonably foreseen the plaintiff's conduct which resulted in her injuries.

*Schlicht v. Thesing*, 35 Wis.2d 221, 151 N.W.2d 119, 121 (1967).

Nor is Wisconsin the only jurisdiction to treat these issues in this manner. In *Tempest v. Richardson*, 5 Utah 2d 174, 299 P.2d 124 (1956), the plaintiff brought an action against the premises owner for injuries she sustained from a fall down the basement stairs. The events leading to the fall began when the plaintiff announced that she was going to the bathroom and started walking down a hallway. Although the plaintiff did not ask directions to the bathroom, the defendant told her that a light was on in the bathroom. Although the plaintiff saw an illuminated room, it appeared to her to be a den or bedroom. For some reason, the plaintiff concluded that a closed door just beyond the illuminated room must have led to the bathroom. This door, however, actually led to the basement; and as the plaintiff stepped in she fell down the stairs.

The Utah Supreme Court affirmed the summary judgment in favor of the defendant, reasoning as follows:

> Appellant had been in respondents' home on a few prior occasions. Although she was not well acquainted with the home, when she started for the bathroom she did not inquire for directions but announced she was going there and was told the light was on in that room. Under such circumstances it would be unreasonable to expect the hosts to anticipate that their guest would open a door not connected with and some distance from the bathroom and step into an unlighted or dark area.

*Tempest*, 299 P.2d at 125–26. *See also Felix v. O'Brien*, 413 Pa. 613, 199 A.2d 128, 130 (1964) (where plaintiff asked directions to the bathroom and defendant replied that it was "right around the corner," but plaintiff instead opened door and stepped into unlighted stairwell, "[t]here was no reason for defendant to anticipate from the direction she gave that her guest would be misled and would not discover what was readily observable.")

Because these factually similar cases from other jurisdictions mandate the same result as the Tennessee law concerning the concept of duty in general, we hold that plaintiff has failed to present legally sufficient evidence as to the duty element on her claims of negligence regarding defendants' failure to leave the lights on and their failure to lock the basement door. Moreover, we hold that defendants had no duty to warn plaintiff of the location of the stairs. Thus, the plaintiff's action must be dismissed because she failed to establish one of the five required elements of any negligence cause of action. *See Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993); *McClenahan v. Cooley*, 806 S.W.2d 767, 774 (Tenn.1991). The Court of Appeals' holding on this issue was therefore correct.

For the foregoing reasons, the judgment of the Court of Appeals is affirmed.

O'BRIEN, C.J., and ANDERSON, REID and BIRCH, JJ., concur.