IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 9, 2004 Session

## SUSAN BEGLEY v. STATE OF TENNESSEE AND TENNESSEE DEPARTMENT OF TRANSPORTATION

Appeal from the Claims Commission for the Eastern Division
No. 20101735     Vance W. Cheek, Jr., Commissioner

No. E2004-00202-COA-R3-CV - FILED OCTOBER 7, 2004

In May of 2000, a car being driven eastbound on Interstate 40 ("I-40") in Knox County by Jeremy Roark left the travel lane and crossed the rumble strips onto the inside shoulder of the road where it collided with a Tennessee Department of Transportation ("TDOT") truck parked during routine litter pick-up. Mr. Roark was killed in the accident and the TDOT employee operating the truck that day, Kenneth Siler, was injured. Susan Begley, Mr. Roark's mother ("Plaintiff"), brought suit against the State of Tennessee. The case was transferred to the Claims Commission ("the Commission") and was tried. The Commission held, *inter alia*, that a reasonable person standard applied and that it was not reasonable for the TDOT truck to be parked on the shoulder. The Commission assessed 45% of the fault for the accident to Mr. Roark and 55% to the State and awarded Plaintiff a judgment for $300,000. The State appeals claiming the Commission lacked jurisdiction, there was insufficient evidence that each element of the negligence cause of action had been met, and there was insufficient evidence to support a finding that Mr. Roark was less than 50% at fault. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission
Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which SHARON G. LEE, J., joined. HERSCHEL P. FRANKS, P.J., filed a separate dissenting opinion.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Michael B. Leftwich, Assistant Attorney General, for the Appellant, State of Tennessee.

Gregory K. Haden, Kingsport, Tennessee, for the Appellee, Susan Begley.

# OPINION

## Background

Plaintiff sued the State of Tennessee after her twenty-year old son, Jeremy Roark, was killed in an accident involving a TDOT truck. The case was transferred to the Claims Commission pursuant to Tenn. Code Ann. § 9-8-402(c) and was tried in October of 2003.

On the day of the accident, May 31, 2000, at approximately 11:30 a.m., Mr. Roark was driving eastbound on I-40 returning home after taking the necessary physical exam to join the Air Force. The day was sunny and clear, and it had not rained recently. The evidence showed Mr. Roark was in good health, was not under the influence of any drugs or alcohol, and was not tired. At the site of the accident, there are three lanes of travel eastbound, an emergency lane on each side, and a grassy median area. Traffic at the time was described as heavy.

A witness to the accident, Alan E. McFarland, II, testified at trial. He stated he and his wife were in a car traveling behind Mr. Roark's car. He testified there were two packs of vehicles and that his car was "in one pack approaching the pack that Jeremy was in." Mr. McFarland testified he was driving approximately 75 miles per hour and was gaining on Mr. Roark's car. At that time, Mr. Roark's car was in the center lane of the three lane eastbound highway. Mr. McFarland testified that Mr. Roark was not speeding, weaving in and out of traffic, tailgating, or driving erratically. Mr. McFarland noticed a tractor trailer ahead of Mr. Roark's car put on its brake lights and then saw Mr. Roark move into the far left lane of travel. Mr. McFarland testified that it was safe for Mr. Roark to change lanes when he did so. As Mr. McFarland described it, Mr. Roark in changing lanes "went a little further and that's when, when I noticed the TDOT truck and, and then, you know, the, the accident after." When questioned, Mr. McFarland stated it looked to him like the right side of the TDOT truck was "right by the rumble strips." He also testified the TDOT truck was parked entirely on the shoulder and not on the grass median.

Richard Fitzgerald, Plaintiff's trial expert, is a consultant performing traffic accident investigation and reconstruction work. Mr. Fitzgerald reconstructed the accident and testified at trial that Mr. Roark's departure from the travel lanes onto the shoulder does not appear to have been based on any problem with environmental or roadway conditions. Mr. Fitzgerald explained that the left front portion of Mr. Roark's car hit the right rear portion of the bed of the truck, went underneath the truck, and hit the wheels on the right side. Police measurements of a skid mark left by the left front tire of Mr. Roark's car show that the car was at least four feet ten inches off the travel lane and onto the shoulder at the beginning of the skid and four feet two inches off at the time of impact. Mr. Fitzgerald explained that the skid mark shows Mr. Roark had steered to the right as the right tires of his car were headed toward the yellow line, back toward the travel lane. Mr. Fitzgerald explained that the skid mark is relatively straight, which means Mr. Roark "took collision avoidance action by braking hard enough at least to lock up one tire" and means the car was tracking normally not fishtailing or out of control. Mr. Fitzgerald stated:

[T]here's no indication that the vehicle was either yawing or fishtailing. There's no indication that it was not under control at the time the brake application occurred. When you lock up your brakes and you lock up all the tires, you've got no steering. You're riding as a passenger. So at that time the vehicle becomes out of your control. It's going to go whichever way it was headed. . . .

At impact, the TDOT truck was pushed from the shoulder entirely on to the grass median.

Kenneth Siler, the TDOT truck operator, is employed by the State of Tennessee working for TDOT and has worked for about eight years as a Highway Worker I. His duties include driving up and down I-40 in Knox County picking up debris on and near the road. Mr. Siler received on-the-job training by accompanying older employees on the job at first, but received no formal instruction on litter pick-up. Ordinarily, Mr. Siler works with another Highway I worker, but he was working alone on the day of the accident. Mr. Siler explained that usually one worker drives the truck and the other looks for debris and traffic hazards like "pieces of metal, aluminum ladders falling off of trucks and gators", which are the remnants of tires. Mr. Siler stated he never knows when he may need to stop. It depends on what debris the workers find as they ride the roads.

On the morning of the accident, Mr. Siler traveled west on I- 40 and then broke for lunch around 11:00 a.m. or 11:30 a.m. After lunch, he started eastbound. He stopped at the site where the accident occurred to pick up a piece of a tire located on the grass median separating the eastbound from the westbound traffic. Mr. Siler testified that the traffic was "real heavy" and the vehicles were traveling around 70 miles per hour at this location. He also admitted that real heavy traffic like this heightened his concerns because of the risk of danger. Mr. Siler explained that as he was lifting the "gator" to throw it into the truck, he heard a noise and then was pushed. He stated he was parked for only a few seconds before the accident happened.

Mr. Siler testified he remembers parking his truck half in the grass median and half on the emergency lane or shoulder. He stated he always gets over in the grass if possible. Mr. Siler testified that at the accident site, the grass median is wide and on that day was dry. The TDOT truck he was driving had a bed width of approximately eight feet. The width of the shoulder is approximately ten and a half feet. If the TDOT truck were parked as Mr. Siler remembers, it would have been sticking four feet into the shoulder leaving approximately six and a half feet between the right side of his truck and the nearest travel lane.

The TDOT truck had a yellow strobe light on the bed of the truck that was working on the day of the accident. The truck also had a red sign approximately "four by four" on its back that said "Caution. Frequent stops." However, there were no advance warning signs showing shoulder work ahead. When questioned, Mr. Siler stated the purpose of rumble strips is to "wake people up if they're asleep or run out of the road or at night."

Mr. Fitzgerald, Plaintiff's expert, testified that the Manual On Uniform Traffic Control Devices ("the MUTCD"), a publication by the Federal Highway Administration, which

contains the "nationally accepted practice for traffic control including work zone type activities", has been adopted by Tennessee as a standard through Tenn. Code Ann. § 54-5-108. When testifying, Mr. Fitzgerald also referred to the Roadside Design Guide ("the Guide"), which discusses roadside features and hazards associated with them. The Guide states it is to be used in conjunction with the MUTCD. Mr. Fitzgerald testified that in its introduction section, the Guide states "[a]bout thirty percent or almost one in every three fatalities are the result of a single vehicle run off the road crash. These figures mean that the roadside environment comes into play in a very significant percentage of fatal and serious injury accidents." He stated that the presence of rumble strips indicates that vehicles leaving the travel lanes and running off the road is a common problem. Mr. Fitzgerald stated the purpose of rumble strips is "to alert a driver that has left the traffic way to the fact that they have now encroached upon the shoulder."

Mr. Fitzgerald testified that the MUTCD calls for the highest level of traffic control to be provided on freeways such as I- 40 and recommends an advance warning sign be used, but provides a list of exceptions to having warning signs. Mobile or short duration operations may fall into the exceptions. Litter pick-up, such as Mr. Siler was engaged in on the day of the accident, is categorized by the MUTCD as a mobile operation. Mr. Fitzgerald stated that in the MUTCD:

> under the mobile operations, one of the points is that safety should not be compromised by using fewer devices simply because the operation will frequently change its location. You may have to do something different, but you don't compromise what you need to do for safety just because you may move a lot. . . . [A]s a general rule the closer the work is to traffic the more traffic control devices that are needed. . . . [W]here you're on or near the roadway edge . . . 'The shoulder should be signed as if the work were on the road itself since it is part of the driver's recovery area'. . . .

Mr. Fitzgerald stated the MUTCD says "it is desirable to provide an unencumbered roadside recovery area." He also stated the MUTCD provides that for:

> operations that move slowly, less than three miles an hour, it may be feasible to use stationary signs. You put up a sign, you leave it there, and move on down the road. That is periodically retrieved and re-positioned in the advance warning area. At higher speeds trucks are typically used to, as far as traffic control zones, they, they move as part of a train behind the work vehicles. . . .

However, Mr. Fitzgerald admitted the MUTCD also provides in its section on mobile and short duration operations that:

> [a]s compared to stationary operations, mobile and short duration operations are distinct activities that may involve different treatments. More mobile devices are needed. For example, signs mounted on trucks and larger, more imposing and more visible devices can be used effectively and economically. For example, appropriately

-4-

colored and marked vehicles with flashing or rotating lights, perhaps augmented with signs or arrow displays, may be used in places, in place of signs and channelizing devices. The trade-off is economical because work duration is short. Mobility is essential. . . . Safety is not compromised as numerous small devices are merely replaced by fewer more dominant and effective devices.

Mr. Fitzgerald admitted the MUTCD does not require either a stationary advance warning sign or a trailing vehicle, but use of these measures simply is recommended practice. He also admitted there were no mandatory standards that were not met by Mr. Siler. In fact, Mr. Fitzgerald admitted the MUTCD says warning signs are not required if the work vehicle has a fast flashing or revolving yellow light, which Mr. Siler's truck did.

When talking about clear roadside principles from the Guide, Mr. Fitzgerald stated if you can't get the vehicle off the road or shield it with something like a guardrail, you can delineate the truck. He explained:

[t]hat would be where, for this type situation the truck has a sign on the back of it. It has a rotating beacon. He may have been flashing his hazard lights. It's painted orange. Trying to make it stand out to delineate that there's something there, . . . if you can't do any of the others, then that may be all you can do.

During his testimony, Mr. Fitzgerald also discussed a section from the Policy On Geometric Design of Highways and Streets, 2001 ("the AASHTO Policy"). The AASHTO Policy is prepared by the American Association of State Highway and Transportation Officials ("AASHTO"), an organization that researches and produces publications for guidance that are used by its members and others across the country. Mr. Fitzgerald admitted the AASHTO Policy states one of the purposes of a shoulder is to accommodate stopped or parked vehicles including maintenance vehicles. The AASHTO Policy states it is desirable for a vehicle stopped on the shoulder to be at least one foot from the travel lane and preferably two feet away. The AASHTO Policy states this recommendation has led to a normal shoulder width of ten feet on high type facilities, such as I-40.

Mr. Fitzgerald testified there are several features about trucks like the TDOT truck involved in the accident that make them a special hazard. He explained that the bed of such trucks sits high and comes right above or at hood level of most cars and that such trucks are fairly rigid or strong compared to cars. In addition, such trucks weigh more than the typical car. Mr. Fitzgerald testified that these features make the potential consequences of an accident involving such a truck and a car extremely severe, even at low speeds.

Mr. Fitzgerald opined that Mr. Siler's TDOT truck was parked entirely on the shoulder at the time of accident with its right side approximately two and a half feet from the edge of the lane of traffic. Mr. Fitzgerald stated the emergency lane is ten foot seven inches wide and that a TDOT truck similar to the one involved in the accident measured a little under eight feet wide.

Mr. Fitzgerald admitted there is no standard in the MUTCD that would require a TDOT truck to park off the shoulder in the grass median. He did not opine whether it was improper for Mr. Siler to park the distance he did from the travel lane. Instead, he stated he believes it was unsafe for Mr. Siler to park two and a half feet from the travel lane.

William Ernest Plemons, Jr., the District Maintenance Superintendent II who supervises maintenance in District 15 which includes Knox, Blount, and Sevier Counties testified at trial. Mr. Plemons, who has been with TDOT for thirty years, supervises Mr. Siler's direct supervisor. Mr. Plemons testified the MUTCD provides that:

> "[s]hort duration activities are generally considered to be those in which it takes longer to set up and remove the traffic control zone than to perform the work. Typically such operations can be accomplished in sixty minutes or less. There are hazards involved for the crew in setting up and taking down a traffic control zone. Also the work time is short. The time during which motorists are affected is significantly increased when additional devices are installed and removed. Considering these factors, it is generally held that simplified control procedures are warranted for short duration activities. Such shortcomings may be offset by other, use of other more dominant devices such as special lighting units or work vehicles."

Mr. Plemons explained he implements the MUTCD recommendations in his work by using trucks with strobe lights and a warning sign on the tailgate. Mr. Plemons stated the MUTCD also provides "'[w]arning signs are not required if the work vehicle displays a flashing or revolving yellow light if the distance between the location is one mile or more or if the work vehicle travels the traffic speed between the locations.'" Mr. Plemons stated it would not have been practical for Mr. Siler to have set up any signs. He also testified he believes Mr. Siler to be an honest man and takes him for his word as to where he was parked that day.

After a trial, the Commission entered a Judgment on December 8, 2003, finding, *inter alia*, that the TDOT truck was parked entirely on the shoulder, and that Mr. Roark was negligent in leaving the road, but this was not the proximate cause of the accident. The Commission specifically did not find that Mr. Siler had lied about where he parked the truck, but that he was simply mistaken. The Commission stated "[t]his is not a credibility issue." Rather, the Commission simply found the evidence that the truck was parked entirely on the shoulder to be more persuasive. The Commission also found the MUTCD to be relevant to the facts and issues in this case, but held it does not control because the MUTCD contains recommendations, not mandatory standards regarding the issues involved in this case. Rather, the Commission stated a reasonable person standard applies because a reasonable person standard is a "ribbon that weaves throughout the entire MUTCD . . . ." The Commission applied a reasonable person standard and found it was reasonable for Mr. Roark's car to be on the shoulder, it was not reasonable for the TDOT truck to have been parked there, and that the TDOT truck was too close to the lanes of travel as it was in the recovery zone. The Commission stated "[t]here needed to be a buffer to the truck or the truck needed to be

off the road totally." The parties had stipulated the damages to be in excess of $600,000. The Commission held that Mr. Roark was 45% at fault because he left the travel lanes and that the State was 55% at fault for the accident and awarded Plaintiff a judgment for the maximum of $300,000 as allowed under the statute. The State appeals to this Court.

## Discussion

Although not stated exactly as such, the State raises three issues on appeal: 1) whether the Commission erred in holding it had jurisdiction under Tenn. Code Ann. § 9-8-307(a)(1)(J); 2) whether the evidence preponderates against the Commission's finding that all the elements of negligence were proven; and, 3) whether the evidence preponderates against the Commission's finding that Mr. Roark was less than fifty percent at fault for the accident.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first will consider whether the Commission erred in holding it had jurisdiction under Tenn. Code Ann. § 9-8-307(a)(1)(J). Tenn. Code Ann. § 9-8-307(a)(1) provides, in pertinent part:

(a)(1)  The commission or each commissioner sitting individually has exclusive jurisdiction to determine all monetary claims against the state based on the acts or omissions of "state employees," as defined in § 8-42-101(3), falling within one (1) or more of the following categories:

(A) The negligent operation or maintenance of any motor vehicle or any other land, air, or sea conveyance. In addition, the state may be held liable pursuant to this subdivision for the negligent operation of state-owned motor vehicles or other conveyances by persons who are not state employees; provided, that such persons operated the vehicle or other conveyance with the permission of a state employee;

* * *

(C) Negligently created or maintained dangerous conditions on state controlled real property. The claimant under this subsection must establish the foreseeability of the risks and notice given to the proper state officials at a time sufficiently prior to the injury for the state to have taken appropriate measures;

-7-

* * *

(I) Negligence in planning and programming for, inspection of, design of, preparation of plans for, approval of plans for, and construction of, public roads, streets, highways, and bridges and similar structures, and negligence in maintenance of highways, and bridges and similar structures, designated by the department of transportation as being on the state system of highways or the state system of interstate highways;

(J) Dangerous conditions on state maintained highways.    The claimant under this subsection must establish the foreseeability of the risk and notice given to the proper state officials at a time sufficiently prior to the injury for the state to have taken appropriate measures;

* * *

(M) Negligent operation of machinery or equipment; . . .

Tenn. Code Ann. § 9-8-307(a)(1) (Supp. 2003).

The Commission held it had jurisdiction under Tenn. Code Ann. § 9-8-307(a)(1)(J). In its appellate brief, the State argues that Tenn. Code Ann. § 9-8-307(a)(1)(J) "does not apply to the type of two-vehicle collision at issue here."   The State cites to *Sweeney v. State*, in which our Supreme Court held that in cases under subsection (J), a court "should consider the physical aspects of the roadway, the frequency of accidents at that place in the highway and the testimony of expert witnesses . . ." in making the factual determination of whether the condition of the highway is dangerous. *Sweeney v. State*, 768 S.W.2d 253, 255 (Tenn. 1989) (quoting *Holmes v. Christopher*, 435 So.2d 1022, 1026 (La. Ct. App. 1983)).   The State argues that "[t]his analysis clearly contemplates potential liability based on the <u>physical condition</u> of the actual roadway . . . ."  In addition, the State cites to *Smith v. State*, in which this Court declined to hold that jurisdiction existed under subsection (J) in a case involving a state vehicle that was parked. *Smith v. State*, No. W2002-00874-COA-R3-CV, 2002 Tenn. App. LEXIS 939 (Tenn. Ct. App. Dec. 30, 2002), *no appl. perm. appeal filed*.  We agree with the State's assertion that jurisdiction in the instant case does not fall under subsection (J).

However, Plaintiff's Complaint also pled that jurisdiction was present under Tenn. Code Ann. §§ 9-8-307(a)(1)(A), (C), (I), and (M).  In our *Smith v. State* opinion relied on by the State, this Court discussed whether the parking of a police cruiser properly fell into the category of negligent operation of a vehicle under subsection (A) and held that jurisdiction was proper under subsection (A).  *Smith*, 2002 Tenn. App. LEXIS 939, at *12-14.   The *Smith* Court stated "[r]egardless of whether [the trooper] was inside of the vehicle when the accident occurred,

-8-

operation of the vehicle by [the trooper] resulted in the condition and placement of the vehicle at the time of the accident causing injuries to [the plaintiff]." *Id*. at *14.

The operative facts in the instant case are similar to the *Smith* case. Just as in *Smith*, the Commission in this case had jurisdiction to adjudicate whether the operation and parking of the state owned vehicle was negligent and whether, if it was negligent, it was the proximate cause of the injuries suffered by Mr. Roark. As Plaintiff pled a proper basis for jurisdiction, we hold the Commission did have jurisdiction to adjudicate the issues involved in this suit under Tenn. Code Ann. § 9-8-307(a)(1)(A).

We next will consider whether the evidence preponderates against the Commission's finding that all the elements of negligence were proven. To prove negligence, a plaintiff must show "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, causation." *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000).

The State argues it did not owe a duty to Mr. Roark; that even if it did owe a duty, there was no breach; and that Mr. Siler's parking the TDOT truck on the shoulder was not the proximate cause of the accident. As our Supreme Court instructed in *Rice v. Sabir*:

> In analyzing duty, the court must balance the foreseeability and gravity of the potential risk of harm to a plaintiff against the burden imposed on the defendant in protecting against that harm. *McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 902 (Tenn. 1996). A "risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

*Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). "This analysis applies even when the injury-causing condition was purportedly open and obvious." *Id*. at 309.

In the case at hand, Plaintiff's expert, Mr. Fitzgerald, testified that the Guide states "[a]bout thirty percent or almost one in every three fatalities are the result of a single vehicle run off the road crash. These figures mean that the roadside environment comes into play in a very significant percentage of fatal and serious injury accidents." He also testified that the presence of rumble strips indicates that vehicles leaving the travel lanes and running off the road is a common problem. Further, Mr. Fitzgerald testified there are several features about trucks like the TDOT truck involved in the accident that make them a special hazard, including the fact that the truck bed sits high, the truck is fairly rigid or strong, and the truck weighs more than the typical car. Mr. Fitzgerald stated these features make the potential consequences of an accident involving such a truck and a

-9-

car extremely severe, even at low speeds. Given these facts, it was foreseeable a car could leave the travel lanes and run onto the shoulder of the road and that a collision between such a car and the TDOT truck would have severe, potentially fatal, consequences.

Further, Mr. Siler testified he always gets over in the grass if possible and there was nothing to prevent him from pulling the TDOT truck completely onto the grass median on that day at that site. Mr. Siler candidly admitted in his testimony that the traffic on the interstate where the accident occurred was "real heavy" and traveling generally around 70 miles per hour. He further admitted that this high speed, real heavy traffic caused him concerns because it increased the risk. Clearly, as evidenced by his policy of always pulling onto the grass if possible, Mr. Siler, as would any reasonable driver, could and did foresee the risk of parking on the shoulder and the potential gravity of harm. Even though the injury-causing condition, the parked TDOT truck, purportedly was open and obvious, given the foreseeability and the gravity of the potential harm, the State owed a duty to Mr. Roark and other drivers traveling on I-40.

The duty owed to Mr. Roark and other drivers was breached when Mr. Siler parked the TDOT truck closer to the travel lanes than necessary at that site. The evidence does not preponderate against the Commission's finding that the TDOT truck was parked entirely on the shoulder, too close to the lanes of travel, and in the recovery zone. Mr. Siler's testimony establishes that there was no reason he could not have parked the truck on the grass median and it was his usual practice to do so. Although Mr. Siler violated no mandatory standards by parking where he did, he did not act as a reasonable person by parking entirely on the shoulder given the facts in this case.

We in no way mean to suggest that TDOT, or other drivers, always must pull their vehicles completely off the shoulder or be in violation of the reasonable person standard. A determination of whether the reasonable person standard has been violated is fact driven and will depend entirely upon the specific facts of each particular case. There will be numerous situations where it is either impossible or unsafe to pull a TDOT truck or other vehicle completely off the shoulder. We need not and are not addressing any situation except the one posed by the particular facts in the case at hand.

The State argues Mr. Roark was negligent and that his conduct, not Mr. Siler's, was the proximate cause of the accident. The State relies upon *Bennett v. Putnam County, Tennessee*, in which this Court held that the actions of an ambulance driver in parking the ambulance were not the proximate cause of an accident because the car that struck the ambulance left its travel lane and crossed into the on-coming travel lane prior to striking the ambulance. *Bennett v. Putnam County, Tennessee*, 47 S.W.3d 438 (Tenn. Ct. App. 2000). The State cites to *Bennett* for the proposition that "[t]he general rule is that every person has a right to presume that every other person will do his duty and obey the law." *Id.* at 444 (quoting *Donaho v. Large*, 158 S.W.2d 447, 451 (Tenn. Ct. App. 1941)).

However, in *Bennett*, this Court also discussed the fact that "[a]n act or omission will not be considered a proximate cause of an injury if a reasonable person could not have foreseen or

-10-

anticipated the injury." *Id*. In *Bennett*, the ambulance driver could not have foreseen that another driver would leave the unobstructed eastbound travel lane, cross into the westbound travel lane, and then collide with the ambulance which was parked at the scene of a previous accident with its lights on. *Id*. In addition, the *Bennett* Court noted that from the testimony, it appeared the driver of the car that left its travel lane "simply did not have her vehicle under proper control and was not devoting full time and attention to the driving of her vehicle." *Id*.

The case at hand differs significantly from *Bennett*. In this case, as discussed above, Mr. Siler could reasonably foresee a possible injury as a result of parking the TDOT truck on the shoulder at this heavy and high speed traffic location. In addition, there was no evidence presented in the case at hand as to why Mr. Roark left his lane of travel and we cannot, and will not, speculate that he was not devoting full time and attention to his driving. As such, the holding in *Bennett* does not control this case. We hold that the action of Mr. Siler in parking the TDOT truck in an unsafe position was a proximate cause of the accident.

Finally, we consider whether the evidence preponderates against the Commission's finding that Mr. Roark was less than fifty percent at fault for the accident. The State's appellate brief argues that the fact that Mr. Roark's vehicle left the travel lanes "creates a presumption of negligence" and that given the evidence that Mr. Roark's vehicle left the travel lanes "the presumption that a deceased person was acting with due care disappears." Expressing no opinion about whether these contentions are correct, we note the Commission did find Mr. Roark to have been negligent and to have been 45% at fault for the accident. Significant fault was assigned to Mr. Roark. Thus, we need not discuss any further the State's assertions regarding such presumptions.

The State cites to *Eaton v. McLain*, in which our Supreme Court presented a list of factors that a trier of fact may consider when assigning fault. *Eaton v. McClain*, 891 S.W.2d 587 (Tenn. 1994). These factors include:

> (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as an attempt to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.

*Id*. at 592 (footnotes omitted). However, the *Eaton* Court specifically stated that these factors are not exclusive and "the percentage of fault assigned to each party should be dependent upon all the circumstances of the case . . . ." *Id*.

-11-

An analysis of the facts of this case applying the *Eaton* factors shows there is a direct causal relationship between the conduct of Mr. Siler in parking the TDOT truck completely on the shoulder and the injuries to Mr. Roark. There was no reason Mr. Siler could not have parked the truck completely off the shoulder on the grass median at this site. The evidence in the record before us is that if Mr. Siler had parked the truck completely, or even half of the truck, on the grass median, the collision would not have occurred. The evidence shows Mr. Siler was aware of the risk in parking entirely on the shoulder as evidenced by his testimony that it was his usual practice to pull the truck onto the grass if possible. In addition, Mr. Siler failed to reasonably utilize an existing opportunity to avoid injuring others. Mr. Siler's testimony was that the grass median at the accident site is wide and on that day was dry and there was no reason he could not have pulled the TDOT truck entirely onto the grass median. The State argues that Mr. Roark could have avoided the accident by staying in his travel lane. However, as discussed above, even though the record is devoid of evidence showing why Mr. Roark left his lane of travel, the Commission did allocate 45% of the fault to him. The fourth *Eaton* factor is not applicable to this case. The fifth factor, when considered, shows that Mr. Siler's task of litter pick-up, while useful and necessary, could not be considered to be a significant one, such as an attempt to save the life of another, as the litter then being picked up was off the road completely. As for the final *Eaton* factor, Mr. Siler was trained to do his job by riding the roads with more experienced employees and the evidence shows he understood the dangers and risks inherent in parking the TDOT truck on or near the highway. Thus, the analysis of the facts of this case applying the *Eaton* factors supports the Commission's assignment of fault.

Other evidence presented in the case also supports the Commission's apportionment of fault. Mr. McFarland, a witness to the accident, testified the TDOT truck was parked entirely on the shoulder and not on the grass median. He also stated that it looked to him like the right side of the TDOT truck was "right by the rumble strips." The evidence showed that rumble strips are designed to alert a driver who has left the travel lane. Mr. Fitzgerald, Plaintiff's expert, testified that the presence of rumble strips indicates that vehicles leaving the travel lanes and running off the road is a common problem. Mr. Fitzgerald opined that Mr. Siler's TDOT truck was located entirely on the shoulder at the time of the accident parked with its right side approximately two and a half feet from the edge of the lane of traffic. The Commission found the truck was too close to the travel lanes and that it was in the recovery zone. The evidence does not preponderate against these findings.

Mr. McFarland, who witnessed both the accident and Mr. Roark's driving just prior to the accident, testified that Mr. Roark was not speeding, weaving in and out of traffic, tailgating, or driving erratically. Mr. McFarland testified that when Mr. Roark moved from the center lane to the left lane, it was safe for him to do so. Plaintiff's expert testified that the skid mark showed that Mr. Roark took collision avoidance and had steered to the right, back toward the travel lane. The evidence does not preponderate against the Commission's finding that Mr. Roark was less than fifty percent at fault for the accident and, therefore, we affirm the Commission's findings allocating fault.

## **Conclusion**

The judgment of the Commission is affirmed, and this cause is remanded to the Commission for collection of the costs below.  The costs on appeal are assessed against the Appellant, the State of Tennessee.


_____
D. MICHAEL SWINEY, JUDGE