IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 15, 2005 Session

## MATTHEW BALLARD v. SERODINO, INC.

**Appeal from the Circuit Court for Hamilton County**
**No. 02C843    Samuel H. Payne, Judge**

---

**No. E2004-02656-COA-R3-CV - FILED OCTOBER 31, 2005**

---

Matthew Ballard filed this action pursuant to the federal Jones Act, seeking damages for the injuries he sustained when he fell on the deck of a barge owned and operated by his employer, Serodino, Inc. ("the defendant"). The jury returned a verdict assessing 75% of the fault to the plaintiff and 25% of the fault to the defendant. As a consequence of the jury's allocation of fault, the plaintiff was awarded $37,500, *i.e.*, 25% of the total damages found by the jury. The plaintiff appeals, arguing that there is no material evidence to support a finding that he was 75% at fault. He also argues that the trial court erred in failing to grant his motion for a directed verdict. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

B. Stewart Jenkins, Chattanooga, Tennessee, for the appellant, Matthew Ballard.

Robert W. Sauser, Chattanooga, Tennessee, for the appellee, Serodino, Inc.

**OPINION**

I.

The defendant owns and operates several barges and towboats on the Tennessee River. For more than three years,[1] the defendant employed the plaintiff as a deck hand on one of its towing vessels. At all relevant times, the plaintiff was working at one of the defendant's facilities on the Tennessee River in Chattanooga. This facility, commonly known to the defendant's employees as

---

[1] The plaintiff was first employed by the defendant for approximately four months before leaving to serve a criminal sentence. Upon his release from custody, the plaintiff returned to work for the defendant, where he remained from September, 1999, until June, 2002.

"the fleet," is a holding area for moored barges, *i.e.,* those barges not then actively engaged in commerce on the river. The fleet area is divided into two sections – one section is designated as the holding area for barges loaded with commercial goods, while the other section is utilized to hold empty barges. The moored barges are linked to one another by ropes, or lines, and then tied to a work barge, which is the stationary barge closest to the bank of the river. At any given time, the fleet's configuration may span as many as six barges in width and five barges in length.

At 11:00 p.m., on November 24, 2001, the plaintiff began a six-hour shift at the defendant's fleet facility in Chattanooga. The weather was described as misty. At approximately 11:30 p.m., the plaintiff set out on the routine task of inspecting and securing the lines which tied the empty barges together. The plaintiff was equipped with a standard-size flashlight provided by the defendant to assist him in his work. While walking across an empty flat barge, which was located four to five barge-widths away from the shore and one to two barge-lengths down the river, the plaintiff stepped in an oily substance, lost his footing, and fell. As a result of the fall, he suffered injuries to his low back and left leg.

The plaintiff filed suit against the defendant under the Jones Act alleging that his injuries were proximately caused by the defendant's negligence in failing to maintain its barges in a safe and seaworthy manner and in failing to provide adequate lighting at the fleet facility. In its answer, the defendant asserted that the plaintiff was at fault in failing to exercise reasonable and ordinary care for his own safety. Specifically, the defendant alleged that the plaintiff was not paying attention to where he was walking at the time of the accident.

The case proceeded to trial before a jury. The jury returned the following verdict: (1) the barge upon which the plaintiff fell was not "unseaworthy," as that word is defined in the Jones Act; (2) the plaintiff and the defendant were both negligent; (3) 25% of the fault was attributable to the defendant; (4) 75% of the fault was that of the plaintiff's; and (5) the plaintiff sustained total damages in the amount of $150,000. Because the Jones Act provides for a system of pure comparative fault, the plaintiff was awarded 25% of his total damages, or $37,500. The plaintiff appeals.

II.

The plaintiff urges us to hold that the trial court erred when it denied his Motion to Alter or Amend and/or for a New Trial "where there is no material evidence to support a verdict of 75%

negligence on the part of the plaintiff."  He also contends that the trial court erred in denying his motion for a directed verdict on the issue of his contributory fault.[2]

Tennessee's adoption of a modified comparative fault in negligence actions changed the nature of the inquiry when a defendant alleges fault on the part of the plaintiff.  The question is no longer whether the plaintiff was guilty of *any* fault; rather, the question is whether – assuming the plaintiff and the defendant are both guilty of fault that proximately causes the subject incident – the fault of the plaintiff is equal to or greater than the fault of the defendant.  ***Eaton v. McLain***, 891 S.W.2d 587, 590 (Tenn. 1994).  Thus, the issue under the Tennessee modified comparative fault system is whether there is material evidence to support a finding that the plaintiff was guilty of at least 50% of the fault.  *See **Martin v. Drinnon***, No. E2003-02106-COA-R3-CV, 2004 WL 1857098, at *3 (Tenn. Ct. App. E.S., filed August 18, 2004), *perm. app. denied*, January 24, 2005.  In the instant case, however, since we are dealing with a pure comparative fault system, not Tennessee's modified comparative fault,  the question presented by plaintiff's first issue is whether there is material evidence to support the jury's finding that the plaintiff was 75% at fault, not whether the plaintiff's fault was equal to or greater than the defendant's fault.

III.

Like railway employees under the Federal Employers' Liability Act, the Jones Act, codified at 46 U.S.C.A. app. § 688(a) (2005), provides seaman with a cause of action for negligence when injured in the course of employment.  The Act provides, in pertinent part, as follows:

> Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply
> . . . .

***Id.***  A suit under the Jones Act may be brought in a federal court, a state court, or any other court of general common law jurisdiction.  ***Carroll v. Choctaw Transp. Co.***, No. 92-154, 1995 WL 140818, at *2 (Tenn. Ct. App. W.S., filed March 31, 1995) (citing 2 Martin J. Norris, The Law of Seamen § 30:25 (1985)).  Although negligence under the Jones Act is determined using the traditional reasonably prudent person standard, there is a reduced standard of causation which only requires the plaintiff to show that the employer's negligence was *one* cause, not necessarily the *only* cause, of his injuries.  ***Perkins v. Am. Elec. Power Fuel Supply, Inc***., 246 F.3d 593, 598 (6th Cir. 2001).

---

[2] We note that the plaintiff also lists the following as an issue in his brief:  "whether the trial court erred in refusing Plaintiff's request for a special jury instruction on unseaworthiness."  Though the plaintiff stated this issue in the section of his brief entitled "Issues Presented For Review," he failed to address it in the argument section of the brief. *See* Tenn. R. App. P. 27(a)(7).  When an issue is raised but ignored in the argument section of the brief, it is considered waived.  ***Bean v. Bean***, 40 S.W.3d 52, 56 (Tenn. Ct. App. 2000); ***Blair v. Badenhope***, 940 S.W.2d 575, 576-77 (Tenn. Ct. App. 1996).

As previously mentioned, a significant aspect of negligence cases brought under the Jones Act is the treatment of the plaintiff's contributory or comparative fault. The Jones Act employs a pure comparative fault system, whereby "the damages recoverable are to be diminished in proportion to the amount of negligence attributed by the jury to the employee . . . ." 32B Am. Jur. 2d *Federal Employers' Liability, Etc.* § 75; *see also* **Tolar v. Kinsman Marine Transit Co.**, 618 F.2d 1193, 1195 (6th Cir. 1980) ("[C]ontributory negligence is a valid defense in an action [under the Jones Act], though it results in an allocation of fault on a comparative basis rather than a bar to recovery."). As opposed to Tennessee's modified comparative fault requiring that the plaintiff be less at fault than the defendant, a plaintiff in a Jones Act negligence case can recover 1% of its damages even if he or she is 99% at fault. In commenting on the parameters of a plaintiff's comparative fault under the Jones Act, the Sixth Circuit has stated that there must be "evidence of some negligent act or omission by the plaintiff other than his knowledgeable acceptance of a dangerous condition." **Tolar**, 618 F.2d at 1196 (citation omitted). In other words, the plaintiff's act of working in an inherently dangerous environment, where the only choice is to face danger or quit one's job, is not enough to rise to the level of comparative fault. The plaintiff goes to great lengths to cite authority for the proposition that an employee, under the Jones Act, is *not* considered negligent if he or she "assumes the risk" of continuing to work in a dangerous environment where the employer has not provided safer alternatives. *See* **Tolar**, 618 F.2d at 1195-96. We agree with this basic proposition, but we find that the plaintiff's reliance on the proposition is misplaced. In the instant case, the charge of contributory, or comparative, negligence on the part of the plaintiff is not based on the plaintiff's continued self-exposure to the inherently dangerous work environment provided by the defendant. If that were the case, we would agree that, had the defendant not provided a safe way to avoid the accident, the plaintiff could not be faulted for choosing to continue to face the risks. Here, the defendant's contention of fault on the part of the plaintiff stems from the alleged failure of the plaintiff to exercise the care ordinarily necessary under the circumstances, *i.e.,* the plaintiff was negligent in failing to give the attention necessary to walking across this unfamiliar barge on a dark and misty night. Where work conditions contain frequent risks and hazards, a plaintiff is still responsible for exercising ordinary care for his or her own safety.

IV.

Our standard of review after a trial court approves a jury's verdict is limited to determining whether the record contains any material evidence to support the jury's verdict. Tenn. R. App. P. 13(d). *See also* **Washington v. 822 Corp.**, 43 S.W.3d 491, 494 (Tenn. Ct. App. 2000). The process of ascertaining the evidentiary support for a jury's verdict is extremely deferential to the verdict. *See* **Kelley v. Johns**, 96 S.W.3d 189, 194-95 (Tenn. Ct. App. 2002). This narrow search for *any* material evidence is a procedural safeguard to a litigant's constitutional right of trial by jury; thus, it "requires us to take the strongest legitimate view of all the evidence to uphold the verdict, to assume the truth of all that tends to support it, to discard all to the contrary, and to allow all reasonable inferences to sustain the verdict." **D.M. Rose & Co. v. Snyder**, 206 S.W.2d 897, 901 (Tenn. 1947); *see* **Kelley**, 96 S.W.3d at 194. This Court is not permitted to second-guess the jury's findings by reweighing the evidence to decide where it preponderates or to make our own credibility determinations. *See*

-4-

*Electric Power Bd. of Chattanooga v. St. Joseph Structural Valley Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985).

Like all factual determinations made by the jury, the jury's fact-based allocation of fault[3] is reviewed pursuant to the "material evidence" standard. *See **Turner v. Jordan***, 957 S.W.2d 815, 824 (Tenn. 1997); ***Henley v. Dale***, No. M1999-02799-COA-R3-CV, 2002 WL 100402, at *6 (Tenn. Ct. App. M.S., filed January 28, 2002). If the record before us is devoid of any material evidence supporting the jury's allocation of 75% of the fault to the plaintiff, this Court must set aside the verdict below and remand for a new trial. On the other hand, if the record contains material evidence to support the allocation of 75% of the fault to the plaintiff, the jury's determinations must be affirmed.

## V.

## A.

The plaintiff contends that the trial court erred in its role as "thirteenth juror" by affirming the jury's allocation of fault because "[t]here is absolutely no evidence in the record to suggest that [he] was not looking where he was going" or properly paying attention to where he was walking. The crux of the plaintiff's contention is that he did not see, and cannot be legally faulted for not seeing, the oily substance because it "blended in" with the deck of the barge. So, as the plaintiff's argument goes, he was not negligent in failing to see and avoid the oil spill because a reasonably prudent man under the same circumstances would have failed to see the spill and would have proceeded as the plaintiff did.

It is clear that whether the oily substance was visible and whether the plaintiff should have seen it are questions of fact for the jury. *See **Strawn v. SCOA Indus., Inc.***, 804 S.W.2d 80, 82 (Tenn. Ct. App. 1990). Thus, we must focus our attention on whether there is material evidence to support a finding that the plaintiff was at fault in failing to see, and avoid, the oily substance.

Although the plaintiff had not previously worked aboard the particular barge on which he fell, he had extensive work experience at the defendant's fleet facility in Chattanooga. The plaintiff's prior experience at the fleet, which spanned his three years of employment, included similar occasions where he worked at night, worked in inclement weather, and worked on unfamiliar barges. The plaintiff testified that he was aware of the danger associated with working at the fleet. He

---

[3] In a negligence action, after it is determined that both the plaintiff and the defendant are at fault, the jury must consider several factors in allocating the appropriate percentage of fault between the parties. ***Eaton v. McLain***, 891 S.W.2d 587, 592 (Tenn. 1994). Some of the relevant factors considered in assessing and allocating fault include the following factual determinations: (1) the causal relationship between the defendant's conduct and the plaintiff's injury; (2) the reasonableness of each party's conduct in confronting a risk, *i.e.,* whether the party knew of the risk, or *should have known of it*; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; and (4) the party's particular capacities, *i.e.,* age, maturity, *training*, and education. *See **Id.***

further acknowledged that attentiveness was a requirement of the job because of the potential hazards on the barges, *i.e.,* the open spaces, spills, and other obstacles. On top of the plaintiff's general knowledge of the risks associated with his job, on the night in question, the plaintiff was the chief of the deck crew, meaning that one of his primary duties that night was to make sure the deck was clean and clear of safety hazards for himself and his crew members.

Since the plaintiff claims the oil spill was not visible to a reasonably prudent person exercising ordinary care, evidence regarding the physical characteristics of the spill and the adequacy of the lighting at the defendant's fleet facility are relevant. The proof established that the oil spill was approximately the size of a small automobile and slightly darker in color than the surrounding deck of the barge. Also in contrast to the surrounding area, water, presumably rainwater, had formed beads on the surface of the oily substance.

The fleet facility is illuminated by two halogen work lights operated on a sensor and affixed to a pole on shore. One of the work lights is positioned to shine upon the moored loaded barges, while the other shines upon the moored empty barges. Green warning lights, which do not provide a substantial amount of illumination, are also affixed to a pole located on the stationary work barge. In addition to these two permanent sources of light, the defendant provides its employees with a standard-size flashlight to carry with them while working at night or in dimly-lit surroundings. So that they might perform their tasks with the unimpeded use of both hands, most of the defendant's employees, including the plaintiff, secure the flashlight to their life vest in the shoulder area and position the light to shine at an angle which illuminates the area in front of them.

The plaintiff introduced expert testimony in an attempt to establish that the outdoor lighting provided by the defendant was insufficient to permit the plaintiff to see the spill. Using industrial safety standards and his expertise, the plaintiff's expert testified that the minimum amount of illumination necessary for outside walking areas is somewhere between one to five foot-candles.[4] He then testified that he obtained a reading of twelve one-hundredths of *one* foot-candle, or .12, at the brightest spot on the stationary work barge, which is closer to the permanent light sources than the actual barge on which the plaintiff fell. The inference suggested by the witness's testimony was that the barge with the oil spill was inadequately lit because it received even less than twelve one-hundredths of *one* foot-candle. However, this evidence fails to account for the illumination provided by the flashlight. When asked how much light a standard-size flashlight can emit, the plaintiff's expert stated that the flashlight's illumination could range between *five to fifteen foot-candles*. When considered in conjunction with the expert's earlier testimony, reasonable minds could conclude that even the bare minimum of light thrown by the flashlight (*i.e.,* five foot-candles) adequately illuminated the plaintiff's walking area based on the expert's earlier stated range of one to five foot-candles.

The plaintiff testified that, prior to the fall, he was properly surveying his path by looking down at the deck of the barge, which was illuminated by the flashlight. He stated that the flashlight illuminated a path some 10 to 12 feet in front of him. He also stated that, other than completing his

---

[4] A "foot-candle" is a common unit of measurement used in assessing brightness.

task of checking the lines on the empty fleet, his attention was not diverted. He was not talking on his radio to coworkers, his hands were free, and since the oil spill was located in the middle of the barge, he was not apprehensive about falling overboard. The proof established that, after the fall, the oil spill was distinguishable by pointing the flashlight directly upon the area of the spill. Furthermore, the expert testimony regarding the lighting conditions could lead one to infer that the light emitted from the flashlight was enough to allow the plaintiff to see the oil spill as he approached it.

The plaintiff's theory that he was not 75% to blame for the accident is not an implausible theory; but the weighing of evidence and witness credibility is not within our prerogative. Given his experience and knowledge in working under similar conditions, the physical attributes of the spill, the lighting provided by the defendant, and the illumination provided by his own flashlight, we cannot say that there is *no* material evidence which would support a finding that the plaintiff should have seen, and avoided, the oil spill if he was actually looking where the flashlight was pointed.

In addition to finding material evidence to support a finding that the plaintiff was guilty of fault in the dynamics of his fall, we also hold that the same evidence supports a finding that he was chargeable with 75% of the total fault. The fall occurred on a flat, unloaded barge. The plaintiff could have easily walked around this large spill. Because of his training, experience, and supervisory position on the evening in question, he should have taken the necessary steps to avoid the oily surface. When the various *Eaton* allocation-of-fault factors are considered, *see Eaton*, 891 S.W.2d at 592, we conclude that there is material evidence to support the jury's allocation of 75% of the fault to the plaintiff.

Thus, after reviewing the record before us, taking the strongest legitimate view of all the evidence to uphold the jury's verdict, assuming the truth of all that tends to support the jury's verdict, discarding all evidence to the contrary, and allowing all reasonable inferences to sustain the verdict, we conclude there is material evidence to support the verdict as rendered by the jury.

B.

The plaintiff also contends that the trial court erred in denying his motion for directed verdict on the issue of his alleged fault. In essence, the plaintiff argues that the lack of direct evidence establishing that he was not paying attention should have precluded the trial court from submitting the issue of his fault to the jury. We disagree.

In order for this Court to conclude that the trial court erred in denying the plaintiff's motion for directed verdict, we must first conclude, after viewing the evidence in the defendant's favor, that the only reasonable conclusion a jury could reach is that the plaintiff was not guilty of *any* fault. *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994); *see also* 32B Am. Jur. 2d *Federal Employers' Liability, Etc.* § 75 ("The extent to which damages should be reduced by reason of the plaintiff's contributory negligence in actions by seaman or railroad employees under the applicable federal statutes is for the determination of the jury, except where the evidence is uncontroverted or

admits of only one reasonable conclusion.").  "If there is any doubt as to the proper conclusions to be drawn from the evidence, the motion must be denied." *Eaton*, 891 S.W.2d at 590 (citing *Crosslin v. Alsup*, 594 S.W.2d 379 (Tenn. 1980)).  In light of our previous discussion of the material evidence supporting a finding that the plaintiff should have seen the oil spill, we must disagree with the plaintiff's contention that the trial court erred in denying his motion for a directed verdict.

VI.

The judgment of the trial court is affirmed.  Costs on appeal are taxed to the appellant, Matthew Ballard.  This case is remanded to the trial court for enforcement of the trial court's judgment and for collection of costs assessed below, all pursuant to applicable law.

_____
CHARLES D. SUSANO, JR., JUDGE