IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 25, 2017 Session

## JESSIE MORGAN v. MEMPHIS LIGHT GAS & WATER

**Appeal from the Circuit Court for Shelby County**
**No. CT-001659-14          Felicia Corbin Johnson, Judge**

_____

### No. W2016-01249-COA-R3-CV

_____

Plaintiff, who fell in a puddle of water on property adjacent to a water tower located on property owned by defendant, a governmental entity, brought suit under the Tennessee Governmental Tort Liability Act, alleging that the water that caused him to fall was caused by drainage from the water tower on defendant's property. Following a trial, the court held that there was no dangerous or defective condition in the water tower, such that it was foreseeable that a person would be injured, and that the defendant had no actual or constructive notice of any dangerous condition that caused plaintiff to fall; as a consequence the Governmental Tort Liability Act did not operate to remove immunity. The court also held that plaintiff and the owner of the property where plaintiff fell were each at least 50 per cent at fault and, therefore, plaintiff could not recover. Plaintiff appeals; discerning no error we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY W. ARMSTRONG, JJ., joined.

Halbert E. Dockins, Jr., Jackson, Mississippi, for the appellant, Jessie Morgan.

Thomas R. Branch and Sasha B. Gilmore, Memphis, Tennessee, for the appellee, Memphis Light, Gas, and Water.

### OPINION

### I. FACTS AND PROCEDURAL HISTORY

Memphis Light Gas and Water ("MLGW") is a governmental entity that owns and operates a water tank atop an elevated portion of land in Capleville, Tennessee; MLGW's

property is adjacent to property owned by Cook Sales, Inc. ("Cook Sales"), where it operates a storage facility. On April 13, 2013, Jessie Morgan and his wife, Tena Morgan, visited Cook Sales with interest in purchasing a storage unit. The Morgans were shown a unit by Frank Fiveash, an employee of Cook Sales; as he exited the unit, Mr. Morgan slipped in a puddle of water and fell, sustaining a rotator cuff tear to his right shoulder that required surgery, rehabilitation, and treatment.

Mr. Morgan filed suit against Mr. Fiveash, Cook Sales, and MLGW on April 11, 2014, alleging he suffered economic losses and personal injuries as a result of the fall; he asserted that the water tank located on MLGW's property leaked, causing water to intrude onto Cook Sales' property and saturate the ground where he fell. MLGW denied liability and asserted several affirmative defenses, including immunity pursuant to the Tennessee Governmental Tort Liability Act, Tennessee Code Annotated section 29-20-101, *et seq*., and comparative fault on the part of Mr. Morgan and Cook Sales. In due course, Mr. Fiveash and Cook Sales were voluntarily dismissed from the case.

A bench trial was held on February 17 and 18, 2016, wherein the trial court heard testimony from Mr. Fiveash; Mr. and Mrs. Morgan and their daughter, Ashley; Theoric Washington, the corporate representative for MLGW; and Mr. Roland Person, MLGW's supervisor for water operations and water plants. At the conclusion of the trial, the court made an oral ruling, subsequently incorporated into an Opinion and Order, in which the court stated numerous factual findings and held as follows:

1. Plaintiff Jessie Morgan has failed to show that Defendant Memphis Light, Gas & Water's water tower caused or created a dangerous or defective condition. The Court further found that the record was void of any problems or leaks for at least a 12-month period prior to the date on which Mr. Morgan was injured.
2. For at least a 12-month period or more, there was absolutely nothing in the record to say that Memphis Light, Gas & Water's water tower had a problem with water runoff. However, if there was a dangerous or defective condition, that condition existed on the Cook Sales property and was the responsibility of Cook Sales.
3. Plaintiff Jessie Morgan has failed to demonstrate that Defendant Memphis Light, Gas & Water had actual or constructive notice of the alleged defective condition which Plaintiff contends caused his injuries.
4. Plaintiff Jessie Morgan failed to prove that Memphis Light, Gas & Water's water tower caused the ground at Cook Sales, Inc. to be wet, saturated and muddy at the time of Mr. Morgan's fall on April 13, 2013.
5. Plaintiff Jessie Morgan failed to prove that Memphis Light, Gas & Water' water tower was the proximate cause of Mr. Morgan's fall and injuries.

2

6.  Defendant Cook Sales, Inc. was responsible for its property. The Court further finds that Cook Sales, Inc.'s employee, Frank Fiveash, knew or should have known that the ground at Cook Sales, Inc. was in a wet and unsafe condition. The Court also finds that Mr. Fiveash knew or should have known that taking a customer to see a shed through the wet, moist area posed a substantial and foreseeable risk that a customer could slip and fall, or otherwise be injured. The Court also finds that Cook Sales, Inc. could have relocated its shed to a safer location, in order to ensure the safety of its guests, but Cook Sales, Inc. elected not to do that.

7.  Plaintiff Jessie Morgan assumes some responsibility for his injuries as he should have appreciated the risk of falling, and should not have taken the risk of walking through the mud. The Court further finds that the risk was clear and that Mr. Morgan saw or should have known that the area was moist.

8.  Plaintiff Jessie Morgan cannot recover under the theory of comparative fault as Mr. Morgan was at least 50% at fault and the Cook Sales was at least 50% at fault for the alleged damages and injuries sustained by the Plaintiff.

The court entered judgment in favor of MLGW.

Mr. Morgan appeals, articulating the following issues:

1.  Did the trial court err by failing to apply the common occurrence doctrine to the repeated instances where water drainage created a dangerous condition on the subject premises?

2.  Should the court have limited the testimony of MLGW's witnesses who had no personal knowledge of the relevant facts of this case?

3.  Did the court err by ruling that comparative fault barred the plaintiff's claims?

## II. STANDARD OF REVIEW

In a non-jury case such as this, our review of a trial court's findings of fact is *de novo* upon the record with a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d).  If, however, the trial court has not made a specific finding of fact on a particular matter, we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Id.* The trial court's conclusions of law are reviewed *de novo*, and are accorded no presumption of correctness. *Kaplan v. Bugalla*, 188 S.W.3d 632, 635 (Tenn. 2006) (citing *State v. Wilson*, 132 S.W.3d 340, 341 (Tenn. 2004)).

**III. ANALYSIS**

*A. Notice*

The Tennessee Governmental Tort Liability Act ("GTLA"), Tennessee Code Annotated section 29-20-101, *et seq.*, grants the governmental entity immunity from suit when engaged in governmental functions. *Benn v. Public Bldg. Auth. of Knox Cty.*, No. E2009-01083-COA-R3-CV, 2010 WL 2593932, at *2 (Tenn. Ct. App. June 28, 2010) (citing *Halliburton v. Town of Halls*, 295 S.W.3d 636, 639 (Tenn. Ct. App. 2008) (perm. app. denied)). There are several exceptions in the GTLA to the grant of immunity. *Halliburton*, 295 S.W.3d at 639. In the complaint, Mr. Morgan did not identify a specific provision in the GTLA by which immunity was removed. The trial court based its ruling on Tennessee Code Annotated section 29-20-204, and in his brief on appeal, Mr. Morgan acknowledges that section 29-20-204 is the basis of his claim that MLGW is liable; the statute provides:

> (a) Immunity from suit of a governmental entity is removed for any injury caused by the dangerous or defective condition of any public building, structure, dam, reservoir or other public improvement owned and controlled by such governmental entity.
>
> (b) Immunity is not removed for latent defective conditions, nor shall this section apply unless constructive and/or actual notice to the governmental entity of such condition be alleged and proved in addition to the procedural notice required by § 29-20-302.[1]

The court in *Fowler v. City of Memphis* explained what constitutes notice for purposes of the GTLA:

> The Tennessee Supreme Court has described actual notice as knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably cautious and prudent persons to investigate and ascertain as to the ultimate facts. Constructive notice, in contrast, is defined as information or knowledge of a fact imputed by law to a person (although he may not actually have it) because he could have discovered the fact by proper diligence, and his situation was such as to cast upon him the duty of inquiring into it. Constructive notice may be established by showing that a dangerous or defective condition existed for such a length of time that a property owner, in the exercise of reasonable care, should have become aware of it. Constructive notice may also be established by showing that the

---

[1] Tennessee Code Annotated section 29-20-302 was repealed by Acts 1987, ch. 405, § 7.

4

dangerous condition resulted from a pattern of conduct, a recurring incident, or a general or continuing condition.

514 S.W.3d 732, 737-738 (Tenn. Ct. App. 2016) (internal citations omitted).

In this case the court made the following findings with regard to the issue of notice:

1. Plaintiff Jessie Morgan has failed to show that Defendant Memphis Light, Gas & Water's water tower caused or created a dangerous or defective condition. The Court further found that the record was void of any problems or leaks for at least a 12-month period prior to the date on which Mr. Morgan was injured.

2. For at least a 12-month period or more, there was absolutely nothing in the record to say that MLGW's water tower had a problem with water runoff. However, if there was a dangerous or defective condition, that condition existed on the Cook Sales property and was the responsibility of Cook Sales.

3. Plaintiff Jessie Morgan has failed to demonstrate that Defendant Memphis Light, Gas & Water had actual or constructive notice of the alleged defective condition which Plaintiff contends caused his injuries.

Mr. Morgan contends that the trial court erred in not applying the "common occurrence" theory when it determined MLGW was not given notice that its water tower was causing a dangerous condition on Cooks Sales' property.[2] He argues that constructive notice was given to MLGW by Mr. Fiveash's monthly phone calls to

---

[2] The common occurrence theory of liability was adopted by our Supreme Court in *Blair v. West Town Mall*:

We take this opportunity to hold that in Tennessee, plaintiffs may prove that a premises owner had constructive notice of the presence of a dangerous condition by showing a pattern of conduct, a recurring incident, or a general or continuing condition indicating the dangerous condition's existence. This approach focuses directly on a principle firmly established in our case law that a premises owner's duty to remedy a condition, not directly created by the owner, is based on that owner's actual or constructive knowledge of the existence of the condition. It simply recognizes the logical conclusion that, when a dangerous condition occurs regularly, the premises owner is on constructive notice of the condition's existence. This places a duty on that owner to take reasonable steps to remedy this commonly occurring dangerous condition.

130 S.W.3d 761, 765-66 (Tenn. 2004).

MLGW to complain of water coming from under the tower and MLGW's records show a recurring problem of water draining from MLGW's property down onto Cook Sales' property in May and December 2012 and January 2013.

Testimony regarding the condition of the premises where the water tank was located was provided largely through the testimony of Roland Person, MLGW's supervisor for water operations and water plants. Mr. Person detailed the MLGW water production system and testified that the system includes fifteen overhead storage tanks, including the Capleville tank, that are inspected monthly by MLGW personnel for various matters, including "noticeable water leak[s] from ground" and "water leak on piping." Mr. Person testified that, according to MLGW's inspection records covering all of 2012 through March of 2013, there were no indications of any leaks at the Capleville tank; and that a leak was discovered on April 15, two days after Mr. Morgan's fall.[3]

Although Mr. Morgan relies on the testimony of Mr. Fiveash that he complained to MLGW on several occasions about water leaking on to Cook Sales' property; Mr. Fiveash was unable to provide any dates or times for these complaints. Theoric Washington, a claims adjuster for MLGW, testified relative to calls that MLGW received from Cook Sales from December 2011 through April 13, 2013. Mr. Washington testified that there were consumption check calls in December 2011 and July 2012[4]; a call on January 31, 2012, regarding burst pipe at the back end of the MLGW property, which was investigated and showed some standing water in the grass on Cook Sales' property but no indication of running water; and a call on January 8, 2013, that there was a water leak on the property and, upon inspection, no leak was found.

Consistent with the instruction of *Blair*, the burden of proof was on Mr. Morgan to show that MLGW had actual or constructive notice of the condition of the water tower, which he contends caused water to leak onto the Cook Sales premises, in order to remove MLGW's immunity under the GTLA. Viewed in context and taken as a whole, the testimony of Mr. Fiveash does not preponderate against the trial court's determination that MLGW did not have actual or constructive notice that the water tank caused or created a dangerous condition on Cook Sales property.[5]

---

[3] Mr. Person also testified that there is a "dry inspection" of each tank every five years, where an independent contractor drains the tank and a sanitary survey conducted every two years by the State of Tennessee; the survey conducted in May 2012 did not list any deficiencies with respect to the overhead storage tanks.

[4] Mr. Washington explained that a consumption check is where a customer calls to inquire regarding water consumption.

[5] Moreover, there is no testimony as to the source of the water which caused Mr. Morgan to fall. Plaintiffs did not offer any expert testimony or competent lay testimony that the soggy condition on Cook Sales' property was caused in any way by a leak in the MLGW water tank. Mr. Fiveash's testimony is illustrative:

*B. Admission of Testimony of MLGW Employees*

Mr. Morgan cites to portions of the testimony of Mr. Person and Mr. Washington and argues that the testimony should not have been allowed because the witnesses did not have personal knowledge of the matters about which they testified as required by Rule 602 of the Tennessee Rules of Evidence and they were not designated as experts. The testimony to which he objects was largely based on the witnesses' review of MLGW's business records that were admitted into evidence without objection.

The standard of review of the trial court's admission of evidence was succinctly set forth in *Russell v. Ill. Cent. R.R. Co.*:

> Decisions regarding the admission or exclusion of evidence are entrusted to the trial court's discretion and will not be disturbed on appeal unless the trial court abused its discretion. An abuse of discretion occurs when the court applies incorrect legal standards, reaches an illogical conclusion, or employs reasoning that causes an injustice to the complaining party. When we review the trial court's exercise of discretion, we presume that the court's decision is correct and review the evidence in a light most favorable to upholding the decision.

No. W2013-02453-COA-R3-CV, 2015 WL 4039982, at *8 (Tenn. Ct. App. June 30, 2015) (internal citations omitted).

Mr. Washington testified that, as adjuster for Mr. Morgan's claim, he visited the scene, gathered photographs, and reviewed MLGW records relating to the incident, including those relating to burst pipe at the back of tank in January 2012, which reported standing water on the Cook Sales property but no running water from the tank; that he checked weather reports from January 2013 to the date of the incident; that MLGW

---

Q. Okay. Now, it's your contention that water from MLG&W from this water tower migrated underneath the land and came onto your property; is that correct?
A. Correct.
Q. Okay. Cook Sales has never hired any kind of drainage company or any kind of a plumbing company, or had any -- or done any kind of investigation to determine whether or not that water was actually from MLG&W's tower or from your own property, have they?
A. No.
Q. Okay. Never talked with any kind of engineers to confirm this, correct?
A. No.
Q. Okay. They have never retained anybody to test the water or anything like that; is that correct?
A. No.

records of an investigation made of a reported underground leak on January 8, 2013, showed no leak found; that he did not personally handle any calls relating to the Cook Sales property, but MLGW's phone records indicated no calls from Mr. Fiveash after January 8. Similarly, Mr. Person testified that his knowledge of the matters related to the incident came from his review of MLGW's records that were in his control.[6] Among the records informing Mr. Person's testimony were documents of MLGW's monthly inspections of its water towers, including the Capleville water tower.

Mr. Morgan contends that, pursuant to Rule 602 of the Tennessee Rules of Evidence, the testimony of Mr. Washington and Mr. Person should have been excluded or limited because they had "no personal knowledge of the relevant facts of the case". We respectfully disagree.

Both witnesses were proffered and testified as MLGW employees with knowledge of the facts and circumstances of Mr. Morgan's fall; their testimony, although largely based upon their review of MLGW records, is not a basis to exclude or limit it. Each testified based on the content of the records and their own actions and did not express an expert opinion on the ultimate issues, as contemplated by Tennessee Rule of Evidence 702.[7] The records were admitted without objection and the court did not err in allowing the witnesses to testify on the basis of the information contained therein.[8]

Mr. Morgan also complains that Mr. Person, though not designated as an expert witness, was allowed to testify as to the condition of the property, the cause of muddy spots, rainwater as an "act of God," and what he asserts were hearsay statements of MLGW technicians describing how much water was leaking from MLGW's tower down to Cook Sales' property on April 15, 2013, two days after Mr. Morgan's fall. The testimony cited by Mr. Morgan occurred during the court's examination, wherein Mr. Person was asked to explain the significance of a leak found at the "jockey pump," which is used to occasionally force water out of the tank; the gravamen of the testimony forming Mr. Morgan's assertion of error, which was not objected to at trial, is as follows:

Q. (By the Court) I just have one or two other questions.
On April 15 of 2013 when the MLG&W crew went out to service

---

[6] Mr. Person testified as follows:

Q. All of your information is secondhand; it's not your personal knowledge, correct?
A. That's not correct, because you're asking me questions about things that's in my control. Like right now, I am the steward of the maintenance records.

[7] Such opinions, had they been proffered, would have been admissible pursuant to Rule 701(a).

[8] The records were properly admitted as records of regularly conducted activity, within the meaning of Rule 803(6).

the complaint regarding the leak found at the jockey pump was not working correctly --

A. It had a leak on it.

Q. Yes, okay. If I understood your testimony correctly that the purpose of the pump is to pump water out?

A. Out of the tank.

Q. Out of the tank?

A. That's right.

Q. If it's not working, then the water would not pump out of the tank, is that correct?

A. Right. If it was not working, it would not pump out.

Q. But you found a leak on a line? If you could explain when you say a line?

A. Yes. The jockey pump -- well, during the testimony, you asked me about the lines that feed the tank. The tank is fed by a 24 inch line, so it will move a large amount of water under high pressure, so it would move pretty fast.

The jockey pump on the other hand is designed for us to force water out of the tank so that we can always keep a fresh supply of water with chlorine in it.

In this field with a two inch line, which is a lot smaller than that 24 inch line, so the leak that was actually on the two inch line, the way it was described to me by the technicians that worked on it, because I specifically asked them how much water, what kind of water was leaking, and he told me it was like if a water faucet at your house was dripping because that line at the time because the pump was not on, it was not under pressure. It was just the water that was in that two inch line that forces it out of the tank.

There is a check valve that keeps the water from – the check valve allows water to move in one direction only. So there's a check in between the pump and the tank.

So even though there was a small steady stream of water coming out of it, it wasn't like we do when we intentionally are overflowing the tank or if we were draining the tank, because a two inch line that has no pressure on it is not going to flow water like a 24 inch main would because it blows holes in the ground.

Mr. Person proceeded to answer questions more specifically related to the operation of the pump and its interaction with the other components of the water tower system; at the conclusion of the court's questions, Mr. Morgan did not examine the witness further.

The court did not abuse its discretion in admitting Mr. Person's testimony; it was clearly helpful to the court's understanding of the operation of the system and the determination of the facts at issue, all within the parameters of Tennessee Rule of

9

Evidence 701(a).[9] His testimony, and Mr. Morgan's objection thereto, is substantially similar to that before this court in *Merrell v. City of Memphis*, No. W2013-00948-COA-R3-CV, 2014 WL 173411 (Tenn. Ct. App. January 16, 2014), a suit under the Tennessee Governmental Tort Liability Act, wherein a motorcycle rider sued the City when he was injured after hitting a pothole in the street. Among the witnesses who testified were two City employees who had worked on the road crew for many years; each opined that the pothole at issue could have been formed overnight due to a water leak. *Id*. at *9. The trial court held that the City did not have actual or constructive notice of the dangerous condition, and consequently, the City's immunity from suit was not removed in accordance with Tennessee Code Annotated section 29-20-203(b). *Id*. at *1. The plaintiff appealed, asserting that the trial court's reliance on the lay opinions of the witnesses was error. *Id*. at *3. We determined that the question of how potholes could be formed was within the knowledge and understanding of laymen; we noted that both employees had worked with the City for many years and were experienced in issues related to road maintenance; and we recognized that each testified from their own observations and personal experience seeing potholes form overnight due to water leaks. *Id*. at *9 (internal citation omitted). Accordingly, we affirmed the judgment. *Id*. at *10.

The fact that water flows downhill and accumulates into puddles is clearly within the knowledge and common experience of laypersons. Similarly, the operation of the tank and piping system is capable of understanding by laypersons given an appropriate explanation of how the system is configured to do what it does; this was part and parcel of Mr. Person's testimony. As noted by the trial court, Mr. Person has been employed with MLGW for over thirty years, all in water operations; the court gave his testimony substantial weight.[10] We have reviewed his testimony and agree that he is extremely knowledgeable as to the operation of the system; his testimony, as found by the trial court, was "very telling." His testimony was supported by the MLGW records and Mr. Morgan offered no countervailing proof.

---

[9] Tenn. R. Evid. 701(a) states:

> (a) Generally. If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
> > (1) rationally based on the perception of the witness and
> > (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

[10] The trial court stated the following relative to Mr. Person in its oral ruling:

> The Court found Mr. Roland Person's testimony to be very telling. The Court found that he was extremely qualified, that he has been with MLGW for 32 years, has served in a supervisory capacity for 28 of those 32 years and has always been responsible for the maintenance and operation of MLGW's water operation. He has had substantial training and education. He is licensed by the State of Tennessee. Specifically he is a certified licensed operator. He has a water treatment license, operator license.

*C. Comparative Fault*

Notwithstanding our determination that the record supports the determination that there was no notice of any dangerous condition on MLGW's property and that the evidence does not support a finding that the MLGW water tower caused or contributed to Mr. Morgan's fall, we will address Mr. Morgan's contention that the trial court failed to apply the appropriate principles of comparative fault but "appeared to instead apply the principles of assumption of risk and other defenses superseded when the Tennessee Supreme Court adopted comparative negligence."

The court made the following ruling relative to the defense of comparative fault, which had been pled by MLGW in its answer:

1. Plaintiff Jessie Morgan has failed to show that Defendant Memphis Light, Gas & Water's water tower caused or created a dangerous or defective condition. The Court further found that the record was void of any problems or leaks for at least a 12-month period prior to the date on which Mr. Morgan was injured.

2. For at least a 12-month period or more, there was absolutely nothing in the record to say that MLGW's water tower had a problem with water runoff. However, if there was a dangerous or defective condition, that condition existed on the Cook Sales property and was the responsibility of Cook Sales.

3. Plaintiff Jessie Morgan has failed to demonstrate that Defendant Memphis Light, Gas & Water had actual or constructive notice of the alleged defective condition which Plaintiff contends caused his injuries.

4. Plaintiff Jessie Morgan failed to prove that Memphis Light, Gas & Water's water tower caused the ground at Cook Sales, Inc. to be wet, saturated and muddy at the time of Mr. Morgan's fall on April 13, 2013.

* * *

6. Defendant Cook Sales, Inc. was responsible for its property. The Court further finds that Cook Sales, Inc.'s employee, Frank Fiveash, knew or should have known that the ground at Cook Sales. Inc. was in a wet and unsafe condition. The Court also finds that Mr. Fiveash knew or should have known that taking a customer to see a shed through the wet, moist area posed a substantial and foreseeable risk that a customer could slip and fall, or otherwise be injured. The Court also finds that Cook Sales, Inc. could have relocated its shed to a safer location, in order to ensure the safety of its guests, but Cook Sales, Inc. elected not to do that.

7. Plaintiff Jessie Morgan assumes some responsibility for his injuries as he should have appreciated the risk of falling, and should not have taken the risk of walking through the mud. The Court further finds that the risk was

11

clear and that Mr. Morgan saw or should have known that the area was moist.

8. Plaintiff Jessie Morgan cannot recover under the theory of comparative fault as Mr. Morgan was at least 50% at fault and Cook Sales was also at least 50% at fault for the alleged damages and injuries sustained by the Plaintiff.

(Citations to record omitted). Mr. Morgan correctly notes that the apportionment of fault is a question of fact, which we review with a presumption of correctness. *See Durham ex rel. Durham v. Noble*, No. M2011-01579-COA-R3CV, 2012 WL 3041296, at *3 (Tenn. Ct. App. July 25, 2012).

As an initial matter, we note that to the extent Mr. Morgan suggests that the traditional principles of assumption of risk and other defenses were "superseded" or were otherwise negated by the adoption of the system of comparative fault in *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992), he is incorrect. As noted in *Eaton v. McClain*:

Although the above-mentioned doctrines [remote contributory negligence, last clear chance, implied assumption of risk] no longer have any independent existence, and thus cannot be invoked to completely bar recovery by the plaintiff, the principles of a given doctrine, if relevant, are still to be considered by the jury in apportioning fault.
* * *
In summary, the percentage of fault assigned to each party should be dependent upon all the circumstances of the case, including such factors as: (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party' conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as an attempt to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.

891 S.W.2d 587, 592 (Tenn. 1994) (internal citations omitted).

Upon review of the exhibits and testimony, the record fully supports the findings by the trial court that Mr. Morgan failed to show that MLGW's tank caused a defective condition on the Cook Sales property or, if a dangerous condition existed on the property that MLGW had notice of it. The court properly considered the *Eaton* factors in determining that Cook Sales, which had a duty to use ordinary care to keep its premises

12

safe, and Mr. Morgan, who had a duty to use reasonable care for his own safety, were each at least 50 percent at fault. *See, e.g.*, Tennessee Pattern Jury Instructions, Civil 9.01 and 9.05, respectively. There is material evidence in support of the apportionment of fault.

## IV. CONCLUSION

For the foregoing reasons we affirm the judgment in all respects.

                                    RICHARD H. DINKINS, JUDGE