IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 2, 2019 Session

## CYNTHIA P. LACK v. SAINT THOMAS RUTHERFORD HOSPITAL

**Appeal from the Circuit Court for Rutherford County**
**No. 70967     Robert E. Lee Davies, Senior Judge**

_____

### No. M2018-00879-COA-R3-CV

_____

This appeal involves a visitor at a hospital who was injured when she slipped and fell in an icy parking lot. The visitor filed a claim against the hospital asserting that the hospital was negligent in failing to remedy the dangerous condition created by accumulated ice because the hospital did not take steps to prevent melted snow and ice from refreezing prior to the incident. The hospital filed a motion for summary judgment and, after determining that the hospital did not have a duty to prevent melted snow and ice from refreezing, the trial court granted the hospital's motion. We affirm in part and reverse in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

R. Douglas Hanson and Natalie Rowan Sharp, Nashville, Tennessee, for the appellant, Cynthia P. Lack.

Brian Holmes and Eileen Mary Evans, Nashville, Tennessee, for the appellee, Saint Thomas Rutherford Hospital.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

On Thursday, March 5, 2015, Middle Tennessee experienced a winter storm that left several inches of snow and ice in its wake. Due to this storm, the parking lots at Saint Thomas Rutherford Hospital ("STR" or "the Hospital") were covered with snow and ice by late Thursday morning. Records from the National Oceanic and Atmospheric

Administration ("NOAA") show that, as the storm moved through the area on Thursday, the temperature rose above 26 degrees Fahrenheit. Freezing temperatures continued through the early morning hours of Friday, March 6, 2015, with the temperature reaching a low of 8 degrees at 5:00 a.m. Friday was a clear day with sunshine, and the temperature rose throughout the day, reaching a high of 37 degrees.

Cynthia P. Lack arrived at STR around 11:00 a.m. on March 6 for the birth of her first grandchild. She parked in the center of the patient parking lot near the emergency room entrance. Upon her arrival, Ms. Lack observed that, although there was no snow or ice on the parking lot, it appeared wet. Ms. Lack remained in the hospital for approximately 12 hours. Between 6:00 p.m. and 7:00 p.m., the temperature once again dropped below freezing and, when Ms. Lack began walking back to her vehicle at 11:15 p.m., the temperature was approximately 25 degrees. As Ms. Lack walked across the patient parking lot back to her car, she walked between parked vehicles and slipped on a patch of ice and fell, fracturing her patella.

On February 29, 2016, Ms. Lack filed a complaint against STR in the Circuit Court for Rutherford County. She alleged that the patient parking lot "was in a dangerous condition as it had ice and/or snow on parts of it" and that STR was negligent because it failed to remedy the dangerous condition "by either removing the ice and snow or adequately salting the parking lot." STR filed an answer denying that it was negligent. After deposing Ms. Lack and exchanging written discovery, STR filed a motion for summary judgment asserting that Ms. Lack was "unable to establish the essential elements of duty or breach [of duty] for her premises liability claim."

The Hospital supported its motion for summary judgment with a statement of undisputed facts that was based on the affidavit of David Wheeler, the director of safety and emergency management at STR in March 2015. According to Mr. Wheeler, STR had a written snow and ice removal plan that he helped develop prior to March 2015. The plan prioritized the performance of snow removal efforts as follows: (1) the emergency room entrance and parking lot, (2) the employee parking lot, and (3) the doctor parking lot. Mr. Wheeler stated that Naturescape, Inc. ("Naturescape") was hired to implement STR's snow and ice removal plan in 2015.

On August 24, 2017, Ms. Lack filed a response to STR's motion for summary judgment. She asserted that STR owed her a duty of reasonable care and submitted that the only issue was whether STR breached its duty. Because she had not yet had an opportunity to depose STR's witnesses, Ms. Lack requested additional time to conduct discovery on the issue of whether STR breached its duty. The trial court entered an order on October 6, 2017, reserving judgment on STR's motion for summary judgment and granting Ms. Lack additional time to take the depositions of Mr. Wheeler, Kenneth Warren, and Tonya Pedigo-Price. The court's order permitted Ms. Lack to file a renewed response to STR's motion for summary judgment within 45 days of the last deposition.

Ms. Lack filed a renewed response to STR's motion for summary judgment on December 8, 2017. She asserted that summary judgment was inappropriate because a genuine issue of material fact existed regarding whether STR breached its duty by "failing to remove the snow and ice in a reasonable manner and/or by failing to warn the Plaintiff of latent conditions." Ms. Lack attached to her renewed response excerpts from the deposition of Mr. Wheeler. In his deposition, Mr. Wheeler admitted that he had no personal knowledge of any snow and ice removal efforts performed at STR on March 5 and 6, 2015. For instance, he did not attempt to remove any snow and ice himself or inspect Naturescape's snow and ice removal efforts on those days. Moreover, he had no knowledge of any specific snow and ice removal efforts performed by Naturescape or of any specific times such efforts were performed on the days in question. Mr. Wheeler stated that he assumed Naturescape performed snow and ice removal on March 5 and 6, 2015, because he saw invoices from Naturescape for snow and ice removal performed on those dates.

Ms. Lack also attached to her renewed response excerpts from the deposition of Kenneth Warren, the director of facility operations at STR in March 2015. Mr. Warren's testimony was based on a combination of his personal knowledge of events that occurred on March 5 and 6, 2015, and of what he knew to be the routine practices of STR and Naturescape. He stated that, although Naturescape would spread de-icer and perform most of the snow plowing during a snow and ice event, STR performed some of its own snow and ice removal. For example, under the direction of Mr. Warren, STR employees occasionally used a Kawasaki Mule with a snow blade on the front and an electric ice melt spreader on the back to remove snow and ice.

Mr. Warren stated that, prior to March 2015, he saw STR's written snow and ice removal plan and that, in accordance with that plan, he directed Naturescape to pretreat the STR premises with de-icer any time the weather forecast showed snow and ice. He testified that the plan did not specify using a particular de-icing agent on the STR premises, but it prohibited the use of salt. STR did not purchase its own de-icing agent in 2015. Rather, Naturescape supplied the de-icing agent. According to Mr. Warren, the de-icing agent supplied by Naturescape was ineffective when the temperature dropped below 22 to 24 degrees.

Mr. Warren testified that he and another man, Barry Cox, supervised the work performed by Naturescape. During the March 2015 winter storm, Naturescape used dump trucks to plow snow and spread de-icer at the STR premises on three occasions. Mr. Warren recalled an occasion where he saw 10 to 12 employees of Naturescape "shoveling, walking the sidewalks, putting ice melt out" at 3:00 or 4:00 in the morning.[1] Mr. Warren explained that Naturescape usually performed snow and ice removal efforts at STR around 3:00 or 4:00 a.m. because there were fewer vehicles in the parking lot at

---

[1] Mr. Warren did not specify whether he witnessed this on March 5 or 6, 2015.

that time of day.  After removing snow and ice at 3:00 or 4:00 a.m., Naturescape would usually return "later in the day to work again."

Mr. Warren described the condition of the patient parking lot on March 5 and 6, 2015, as follows:

> A.  . . . I do remember us out scraping, trying to get snow and ice up off of everything, and pre-treating and pre-treating.
> And I know the biggest thing I remember about it is it would freeze about as fast as we could get it to melt.  I know the sun would hit it on the asphalt.  It would start to melt, run down between the vehicles.
> And when the sun started down, it was like it was frozen automatically.  It was so cold, the ground was so cold.  In some spots, the ice was so clear, you couldn't even tell it was ice there.

According to Mr. Warren, STR made announcements requesting that visitors move their vehicles so de-icer could be applied throughout the patient parking lot, but none of the cars were moved.  Thus, Mr. Warren stated that he directed his employees to spread de-icer by hand between parked vehicles.  Mr. Warren testified that "[t]he problem we had there [spreading de-icer between the vehicles] was during the day it would start melting, it would run down, you know, just kind of pool, because it was melting.  By 4:00 in the afternoon, it was starting to freeze over again between vehicles."  Mr. Warren stated that he directed his employees to apply more de-icer as the sun began to set, "but it wouldn't do anything.  It would just sit there, it was so cold."

Ms. Lack also attached to her renewed response excerpts from the deposition of Tonya Pedigo-Price, a registered nurse who worked at STR the night Ms. Lack fell.  Ms. Price testified that she provided care to Ms. Lack after receiving notice that Ms. Lack had fallen in the patient parking lot.  Ms. Price described the condition of the patient parking lot when she went out to assist Ms. Lack:

> A.  It was dark, it was night.  You know, obviously, it had stormed, and there was a lot of debris.
> Q.  And what do you mean by debris?
> A.  Ice, snow.

Finally, Ms. Lack filed the affidavit of John Allin, who has worked in the snow removal industry since the 1970's.  He stated that 24-hour emergency facilities such as STR have a duty to remove snow and ice correctly "to avoid potentially making the parking and walkway surfaces more dangerous to individuals needing access to the hospital facility."  According to Mr. Allin, this duty required STR to apply de-icing agents both in the morning and early evening hours when refreezing can occur.  He explained that, when de-icing agents are applied in the morning, they become diluted as

- 4 -

frozen strata thaws throughout the day. The diluted de-icing agents would then be ineffective at preventing the melted snow and ice from refreezing during the nighttime hours. Thus, Mr. Allin opined that de-icing agents should be reapplied during the early evening hours to prevent thawed snow and ice from refreezing at night. Mr. Allin stated that Mr. Wheeler was incorrect when he declared that de-icing agents are ineffective when the temperature drops below 22 to 24 degrees. Mr. Allin then identified 8 de-icing agents that were effective "at temperatures lower than 23 degrees down to negative 25 degrees."[2]

The trial court heard STR's motion on April 18, 2018. In an order entered on April 23, 2018, the court determined that STR made reasonable efforts to remove natural accumulations of snow and ice on March 5, 2015, and in the early morning hours of March 6, 2015. The court then framed the remaining issues as whether STR "1) had a duty to prevent the accumulation of ice on its parking lot as a result of the snow which melted during the daytime of March 6, but apparently refroze once the sun went down on the evening of March 6; and 2) whether the efforts taken by [STR] (if any) were reasonable as a matter law." After concluding that STR had no duty "to prevent water on the parking lot from freezing and turning to ice which resulted in the injury to Ms. Lack," the trial court granted summary judgment to STR. The trial court further found that, if on appeal this Court determines that such a duty exists, there is a genuine issue of material fact regarding what efforts STR took on the night of March 6, 2015.

On appeal, Ms. Lack raises several issues which we consolidate and restate as follows: whether the trial court erred in granting summary judgment to STR.

STANDARD OF REVIEW

We review a trial court's summary judgment determination de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). Therefore, "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* We "must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor." *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *see also Acute Care Holdings, LLC v. Houston Cnty.*, No. M2018-01534-COA-R3-CV, 2019 WL 2337434, at *4 (Tenn. Ct. App. June 3, 2019).

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

[2] Mr. Allin identified the following deicing agents and the temperatures at which they become ineffective: calcium chloride -25 degrees; magnesium chloride 5 degrees; sodium ccetate 5 degrees; calcium magnesium acetate 5 degrees; potassium chloride 12 degrees; urea 15 degrees; and sodium chloride 20 to 22 degrees.

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. When a party moves for summary judgment but does not have the burden of proof at trial, the moving party must either submit evidence "affirmatively negating an essential element of the nonmoving party's claim" or "demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. Once the moving party has satisfied this requirement, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'" *Id.* at 265 (quoting TENN. R. CIV. P. 56.06). Rather, the nonmoving party must respond and produce affidavits, depositions, or responses to interrogatories or other discovery that "set forth specific facts showing that there is a genuine issue for trial." TENN. R. CIV. P. 56.06; *see also Rye*, 477 S.W.3d at 265. If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party." TENN. R. CIV. P. 56.06. If the moving party fails to show he or she is entitled to summary judgment, however, "'the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the motion for summary judgment fails.'" *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008) (quoting *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)).

## ANALYSIS

Ms. Lack asserts that the trial court erred in concluding that STR did not owe a duty to prevent melted snow and ice from refreezing because, in making this determination, the court failed to "weigh[] the foreseeability and gravity of the potential harm against the burden of preventing the harm."[3] STR responds that the trial court was not required to apply this balancing approach because this case involves a natural accumulation of ice which is governed by prior court decisions. As STR points out, Tennessee courts apply the balancing approach when prior court decisions and statutes have not already established the rules and doctrines governing whether a particular duty exists. *See Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 365 (Tenn. 2008) (explaining that courts balance the foreseeability and gravity of the harm against the burden of preventing the harm "[w]hen the existence of a particular duty is not a given or when the rules of the established precedents are not readily applicable"). Prior Tennessee

---

[3] The Hospital argues that Ms. Lack waived this argument because she failed to raise it in the trial court. *See Lane v. Becker*, 334 S.W.3d 756, 764 (Tenn. Ct. App. 2010) ("A party waives an issue when it raises it for the first time on appeal."). As the party asserting waiver, STR bears the burden of demonstrating "that the issue sought to be precluded [on appeal] was, in fact, not raised in the trial court." *Fayne v. Vincent*, 301 S.W.3d 162, 171 (Tenn. 2009). Ms. Lack contends that, although she did not raise this argument in her pleadings, her "argument during the motion for summary [judgment] hearing began with a discussion about a trial court's role in balancing and weighing evidence when determining the existence of duty." The record contains no transcript of the motion for summary judgment hearing. Due to the absence of a complete record, we conclude that STR failed to demonstrate that Ms. Lack did not raise this argument in the trial court. *See id.* (declining to find waiver where an incomplete record created an ambiguity).

- 6 -

court decisions have established the rules governing a premises owner's duty in regard to natural accumulations of snow or ice. *See Clifford v. Crye-Leike Commercial, Inc.*, 213 S.W.3d 849, 853 (Tenn. Ct. App. 2006); *Bowman v. State*, 206 S.W.3d 467, 473 (Tenn. Ct. App. 2006); *Simmons v. Russell*, No. 01A01-9709-CV-00467, 1998 WL 251751, at *3 (Tenn. Ct. App. May 20, 1998); *Grizzell v. Foxx*, 348 S.W.2d 815, 816-17 (Tenn. Ct. App. 1960). Therefore, as a preliminary matter, we must determine whether this case involves a natural accumulation of ice.

A natural accumulation of snow or ice is defined as "'one which accumulates as a result of an act of nature, whereas an unnatural accumulation is one that results from an act of a person.'" *Kaeppner v. Leading Mgmt., Inc.*, No. 05AP-1324, 2006 WL 1932327, at *3 (Ohio Ct. App. July 13, 2006) (quoting *Coletta v. Univ. of Akron*, 550 N.E.2d 510, 512 (Ohio Ct. App. 1988)). When snow melts and then refreezes, the refrozen material is still considered a natural accumulation of ice. *Id.* at *5. Salting or applying de-icer to a natural accumulation of snow and ice may cause the accumulation to melt but, if the melted material later refreezes, the refrozen material forms a new accumulation of ice that is not considered unnatural. *Barber v. G.J Partners, Inc.*, 974 N.E.2d 452, 457 (Ill. Ct. App. 2012); *see also Scott & White Mem'l Hosp. v. Fair*, 310 S.W.3d 411, 419 (Tex. 2010) ("[S]alting, shoveling, or applying deicer to a natural ice accumulation does not transform it into an unnatural one"); *Kaeppner*, 2006 WL 1932327, at *5 ("'[T]he mere fact that Cracker [B]arrel salted the sidewalk and then allowed the sidewalk to freeze again does not turn the natural accumulation of snow and ice into an accumulation that is unnatural.'") (quoting *Lehman v. Cracker Barrel Old Country*, No. 2004-CV-0048, 2005 WL 267658, at *4 (Ohio Ct. App. Jan. 28, 2005)). Thus, the natural accumulations of snow and ice on the STR premises melted throughout the day on March 6, 2015, (as a result of an application of de-icer on March 5 and during the early morning hours of March 6), and when the melted material refroze that evening, the refrozen material constituted a new natural accumulation of ice. Because the ice at issue was a natural accumulation, STR's duty is governed by already established case law. We conclude that the trial court did not err in declining to apply the balancing approach to determine whether a duty existed in this case.

What are the rules governing a premises owner's duty with regard to natural accumulations of snow and ice? Premises owners have a duty to exercise reasonable care to protect persons legally on their property from unreasonable risks of harm. *Easley v. Baker*, No. M2003-02752-COA-R3-CV, 2005 WL 697525, at *6-7 (Tenn. Ct. App. Mar. 24, 2005) (citing *Basily v. Rain, Inc.*, 29 S.W.3d 879, 883-84 (Tenn. Ct. App. 2000)); s*ee also Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998). Included within this duty is the duty to "maintain[] the premises in a reasonably safe condition either by removing or repairing potentially dangerous conditions or by helping persons avoid injury by warning them of conditions that cannot, as a practical matter, be removed or repaired." *Bowman*, 206 S.W.3d at 473; *see also Eaton v. McLain*, 891 S.W.2d 587, 593-94 (Tenn. 1994) (holding that premises owners owed a duty "to maintain the premises in a reasonably safe

and suitable condition" by "either removing or warning against any latent dangerous condition on the premises of which [the premises owners] were aware or should have been aware through the exercise of reasonable diligence").

Although natural accumulations of snow or ice can create dangerous conditions, they are "considered to be among the 'normal hazards of life.'" *Clifford*, 213 S.W.3d at 853 (quoting *Grizzell*, 348 S.W.2d at 817). Thus, this Court has held that premises owners do not have a duty "to keep their premises free of natural accumulations of snow and ice at all times." *Id.* Moreover, in *Bowman v. State*, this Court held:

> Property owners cannot be held liable for failing to remove natural accumulations of snow or ice when they had no notice of the condition. Forecasts of snow or ice do not, by themselves, constitute actual or constructive notice of dangerous conditions requiring a property owner to begin taking steps either to prevent or to remove accumulations of ice or snow. Thus, *no case has ever imposed a duty on property owners to constantly monitor weather forecasts or to take steps to prevent or forestall possible accumulations of snow or ice.*

*Bowman*, 206 S.W.3d at 473 (citations omitted) (emphasis added). In other words, premises owners have no duty to act until they have actual or constructive notice that a dangerous condition exists due to the accumulation of snow or ice. This holding implicitly recognizes that a dangerous condition must actually exist before a premises owner can be held liable for failing to take action to remedy the alleged condition. *See Nee v. Big Creek Partners*, 106 S.W.3d 650, 653 (Tenn. Ct. App. 2002). Therefore, in cases involving natural accumulations of snow or ice, premises owners have a duty "to take reasonable steps to remove snow and ice within a reasonable time *after* it has formed or accumulated." *Bowman*, 206 S.W.3d at 473 (emphasis added); *see also Clifford*, 213 S.W.3d at 853; *Simmons*, 1998 WL 251751, at *3; *Grizzell*, 348 S.W.2d at 816.

Ms. Lack concedes that Tennessee courts have previously held that premises owners do not have a duty to prevent possible accumulations of snow or ice, but she argues that this case is distinguishable from those prior cases because STR had notice of the dangerous condition. Specifically, she contends that STR, unlike the premises owners in previous cases, had notice of the dangerous condition because the frozen precipitation had already fallen and because the dangerous condition had persisted for between 24 to 36 hours at the time she fell. We respectfully disagree. The frozen precipitation had already fallen prior to her fall, but the record does not support Ms. Lack's argument that the patch of ice on which she fell existed for between 24 to 36 hours prior to the incident.

NOAA records show that frozen precipitation fell throughout the day on March 5, 2015, and that it stopped falling between 10:00 p.m. and 11:00 p.m. that same day. No

additional precipitation fell on March 6, and the temperature reached 37 degrees. Once the frozen precipitation stopped falling on March 5, STR's duty "to take reasonable steps to remove snow and ice within a reasonable time" began.[4] *Bowman*, 206 S.W.3d at 473; *see also Clifford*, 213 S.W.3d at 853 (holding that a business's duty to begin removing accumulated snow had not yet begun at the time of plaintiff's fall because the snow was still falling). The Hospital recognized this duty and undertook steps to remove the snow and ice on March 5. The majority of Mr. Warren's testimony focused on his first-hand knowledge of STR's and Naturscape's efforts to remove the snow and ice on March 5 and during the early morning hours of March 6 by plowing and spreading de-icer. Furthermore, Ms. Lack testified that the parking lot was wet when she arrived at STR, but she saw no ice or snow. The record, therefore, demonstrates that the efforts by STR and Naturescape, in conjunction with rising temperatures during the daytime hours on March 6, resulted in the melting of the initial accumulation of snow and ice before Ms. Lack arrived at STR at 11:00 a.m. Thus, contrary to Ms. Lack's assertion, the patch of ice upon which she fell had not existed for 24 to 36 hours at the time of the incident. Rather, it formed during the early evening hours of March 6 when the forces of nature reasserted themselves and the temperature once again dropped below freezing, causing the melted snow and ice to refreeze.

We discern no distinguishable difference between the circumstances of this case and those of prior cases concerning a premises owner's duty in regard to natural accumulations of snow or ice other than that the accumulation here formed as the result the thawing and refreezing of snow and ice rather than as the immediate result of falling frozen precipitation. *See Clifford,* 213 S.W.3d at 851-52 (involving a plaintiff who slipped and fell in a parking lot completely covered by snow while snow continued to fall); *Bowman*, 206 S.W.3d at 471 (involving a plaintiff who fell in a state parking lot shortly after snow had fallen); *Simmons*, 1998 WL 251751, at *1 (involving a plaintiff that slipped and fell on icy stairs at an apartment complex during a break between rounds of frozen precipitation falling). As discussed above, however, this accumulation constituted a new natural accumulation of ice. Pursuant to the holding in *Bowman*, STR did not have notice of the dangerous condition giving rise to a duty to act until the ice formed or accumulated. The Hospital's duty on Marcy 6, therefore, remained the same as it was on March 5: to take reasonable steps to remove the ice within a reasonable time after it had formed or accumulated.

---

[4] In their appellate briefs, both parties refer to the winter storm that occurred on March 5, 2015 as "ongoing" or "still occurring" on March 6. Premises owners do not have a duty "to continuously remove snow or ice in the middle of an ongoing winter storm." *Clifford*, 213 S.W.3d at 853. This Court has considered a winter storm as "ongoing" in situations where frozen precipitation was actively falling and where it fell intermittently over the course of a couple of days. *See Clifford*, 213 S.W.3d at 853; *Simmons*, 1998 WL 251751, at *1, *3. Here, frozen precipitation did not intermittently fall throughout March 5 and 6, 2015, nor was it actively falling at the time of the incident. As a result, the winter storm was not "ongoing" at the time Ms. Lack fell. We, therefore, decline to consider the parties' arguments relating to ongoing winter storms.

In light of the foregoing, we conclude that the trial court did not err in determining that STR did not owe Ms. Lack a duty to prevent melted snow and ice from refreezing and forming ice on the patient parking lot.[5] This does not end our analysis, however, because there is a genuine issue of material fact regarding whether STR took reasonable steps to remove the ice after it formed or accumulated.

This Court has previously held that what constitutes reasonable efforts to remove snow and ice depends upon, "among other things, (1) the length of time the accumulation has been present, (2) the amount of the accumulation, (3) whether the accumulation could be, as a practical matter, removed, (4) the cost of removal, and (5) the foreseeability of injury." *Bowman*, 206 S.W.3d at 474. Here, Mr. Warren's testimony revealed that the patch of ice had started to form several hours prior to the incident. Describing the efforts STR and Naturescape took to remove snow and ice after it formed, Mr. Warren stated as follows:

> We tried to keep [the visitor parking lot] as clear as possible. It was very difficult there. So we would actually hand spread salt between cars with ice melt to try to keep it off. The problem we had there was during the day it would start melting, it would run down, you know, just kind of pool, because it was melting. *By 4:00 in the afternoon, it was starting to freeze over again between vehicles.*

(Emphasis added). Thus, the record indicates that STR had notice that the melted snow and ice began to refreeze approximately seven hours before Ms. Lack slipped and fell.

There is a dispute regarding what steps, if any, STR took to remove accumulated ice. According to Mr. Warren, Naturescape would usually return later in the day to inspect the premises and perform additional plowing or de-icing if necessary. Mr. Warren did not see Naturescape return later in the day to apply additional de-icer on March 6, however, and there is no evidence in the record showing that Naturescape did so. Mr. Warren stated that STR employees went back out and applied additional de-icer between the vehicles, "but it wouldn't do anything. It would just sit there" because the de-icer Naturescape supplied to STR was ineffective when the temperature dropped below between 22 and 24 degrees. NOAA records contradict this testimony, however,

---

[5] Ms. Lack asserts that, in the absence of a duty to take any preventative action, STR was negligent in not applying a de-icing agent during the early evening hours of March 6, 2015, because STR "had a duty not to create a more hazardous condition." She bases this contention on Mr. Allin's opinion that 24-hour emergency facilities like STR have a duty "to avoid potentially making the parking and walkway surfaces more dangerous." She cites to no authority supporting this argument, however, and we are aware of no such authority. The prior cases establishing a premises owner's duty regarding accumulations of snow or ice do not, explicitly or implicitly, distinguish between premises that are open 24 hours a day and those that are not. *See Clifford*, 213 S.W.3d at 853; *Bowman*, 206 S.W.3d at 473-74; *Grizzell*, 348 S.W.2d at 4817; *Simmons*, 1998 WL 251751, at *3-4. This argument is without merit.

- 10 -

because they show that the temperature on March 6 did not drop below 25 degrees during the seven hours prior to the incident. Moreover, Mr. Allin identified eight de-icing agents that remain effective at or below 23 degrees. The record contains no evidence regarding which de-icing agent was applied at STR. Because a genuine issue of material fact exists regarding whether STR breached its duty to take reasonable steps to remove ice after it formed or accumulated during the evening hours of March 6, 2015, we conclude that the trial court erred in granting summary judgment to STR.

CONCLUSION

The trial court's determination that STR did not have a duty to prevent melted snow and ice from refreezing is affirmed. Although STR did not have a duty to prevent the accumulation of the patch of ice at issue, STR had a duty to take reasonable steps to remove the ice after it accumulated during the afternoon and evening hours of March 6, 2015. Because a genuine issue of material fact exists regarding whether STR breached this duty, the trial court's decision granting summary judgment to STR is reversed. This matter is remanded with costs of appeal assessed against the appellee, Saint Thomas Rutherford Hospital, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE